In re MARRIAGE of Robert L. BUR-
HAM and Carla M. Burham.

Upon the Petition of Robert L. Burham,
Appellant, and concerning Carla M.
Burham, Appellee.

No. 61892.

Supreme Court of Iowa.

Sept. 19, 1979.

Gordon E. Allen, of Allen, Babich & Bennett, Des Moines, for appellant.

James R. Cook, of Flagg, Hockett, Benhart, Golden & Cook, Des Moines, for appellee.

Gary R. Hassel, Des Moines, for minor children.

Considered by REYNOLDSON, C. J., and LeGRAND, HARRIS, ALLBEE, and LARSON, JJ.

ALLBEE, Justice.

In this appeal we again are confronted with the Solomonic burden of determining the custody of children. Both petitioner, Robert L. Burham, and respondent, Carla M. Burham, appeal from the granting to them of joint custody of their two minor daughters. Both parties characterize the joint custody provision of the final decree of dissolution of their marriage as untenable; they both urge that it should be changed to give one parent the permanent custody of the girls, subject to the right of visitation of the other parent. Each claims to be the parent to whom custody should be given. Carla has also cross-appealed from the economic provisions of the decree.

Robert and Carla Burham were married on June 1, 1952. At that time Robert was attending college. Carla, who was seventeen when married, forsook a music scholarship in order to work to help provide financial support for herself and Robert. Robert went on to obtain a master's degree in chemistry, and in the fall of 1955 he took a position with Grandview College. Robert remains with the college as a professor and chairman of the chemistry department. Three daughters were born during the marriage: Melanie Lynn, now married; Susan, born December 12, 1964; and Mary Lee, born August 23, 1966.

The onset of the breakdown of the marriage relationship began after 1969. Until then, the Burhams apparently enjoyed a stable marriage. The commencement of two dissolution actions preceded the bringing of this action: one was filed by Robert in 1971 and another by Carla in 1976. Both actions were dismissed following reconciliations. Robert commenced this action on May 19, 1977.

The process from which a final decree evolved in this case is worthy of note. The trial, protracted over several weeks, consumed six days, the last of which was December 29, 1977. A decree granting dissolution of the marriage was filed January 18, 1978. That decree awarded an automobile and personal effects to each party, placed the children in the temporary legal custody of the Polk County Department of Social Services and permitted both parties and the children to remain in the family residence while awaiting a supplemental decree to deal with permanent custody and support.[1] Trial court also directed that a hearing be held to interview the children in the absence of their parents but in the presence of counsel. Robert was ordered to continue to make the home mortgage payments.

After interviewing the children, trial court, by supplemental decree of March 15, 1978, ordered that the Polk County Department of Social Services continue to exercise temporary custody of the children and that they should remain in the family home. The court further provided that, under supervision of the temporary custodian, Robert assume primary parental responsibility

---

1. During the pendency of this action the parties, by agreement, shared the home, each occupying separate personal areas.

from April 1 through June 14 and that Carla assume the same responsibility from June 15 through August 31. The party not having primary parental responsibility was to move out of the home; the party having such responsibility was to provide the financial support of the children. Visitation was also prescribed. Robert was ordered to pay property taxes, home owner's insurance, utilities and household repair costs, in addition to the home mortgage installments. Attorney fees were also ordered. Gary Hassel, earlier appointed as attorney for the children, was allowed a fee of $1200, of which Carla was to pay $400 and Robert was to pay $800. Robert was also ordered to pay $1750 towards the fee of Carla's trial counsel.

Dissatisfied with trial court's deferring a final determination as to custody, Robert applied to this court for either permission to bring an interlocutory appeal from the supplemental decree of March 15 or the issuance from this court of a supervisory order directing entry of a decree settling permanent custody. On May 10, this court by supervisory order directed trial court to fix the permanent custody of the children. *See* Iowa Const. art. V, § 4 (1857, amended 1962); Iowa R.App.P. 22(a). That order stressed the policy of fixing child custody in a dissolution action as soon as possible. *E. g., Schoonover v. Schoonover*, 228 N.W.2d 31, 34 (Iowa 1975).

Thereafter, on May 23, trial court entered the supplemental decree from which the parties have appealed. Citing recent legislation permitting joint custody in dissolution of marriage cases,[2] trial court decided that joint custody, alternating primary responsibility of the children between Robert and Carla, would best serve the interests of Susan and Mary Lee. The court decreed that the children should remain in the family home with one parent at a time. The initial time periods during which Robert and then Carla would occupy the home with the children were prescribed, with the ultimate arrangement to be semiannual rota-

tions. This arrangement would continue until the youngest child was graduated from high school, after which the home would be sold and the net proceeds divided equally between Robert and Carla. The parent occupying the home would support the children. Visitation rights were established for the parent not occupying the home. Robert retained the same financial obligations as ordered in the March 15 supplemental decree. He also was ordered to pay Carla alimony of $100 per month during the months she would not be in the home with the children until she remarried or Mary Lee finished high school, whichever first occurred.

The primary issue before us is whether trial court's award of joint custody is in the best interests of the Burham children.

## I. *Joint Custody—Background*

Initially, we must consider the ramifications of joint custody. These questions arise: What is joint custody? What is the significance of recent legislation permitting joint custody? How is joint custody viewed by courts, commentators and experts in the field of divorce?

Joint custody reposes in both parents legal responsibility for the care of their children and alternates the physical custody. Bodenheimer, *Progress Under the Uniform Child Custody Jurisdiction Act and Remaining Problems: Punitive Decrees, Joint Custody, and Excessive Modifications*, 65 Calif. L.Rev. 978, 1009–10 (1977). Research reveals that joint custody is generally treated as synonymous with divided custody. *Braiman v. Braiman*, 44 N.Y.2d 584, 589, 407 N.Y.S.2d 449, 450, 378 N.E.2d 1019, 1020 (1978); Bodenheimer, *supra* at 1009. One author, however, has distinguished joint from divided custody. Joint custody, he asserts, involves each parent's having joint control over the care, upbringing and education of the children, even though the children reside most of the year with one parent, while divided custody involves each

2. 1977 Session, 67th G.A., ch. 138, § 1 (now included in § 598.21, The Code 1979).

parent's having the children for a part of the year with control over the children only when in his or her custody. 1 A. Lindey, *Separation Agreements and Ante-Nuptial Contracts* 14–60 (rev. ed. 1978).

We will treat the terms joint custody and divided custody as synonymous because in each such custody arrangement, regardless of the label it is given, both parents share in the legal responsibility for care and alternate in custodial companionship. And each such custody arrangement when contested, whether described as joint or divided, must withstand scrutiny on its terms and conditions.

We must also determine the significance of recent legislation, relied upon by trial court, which permits joint custody of children in dissolution cases. *See* note 2 *supra.* The courts of this state have long been charged by statute with the duty of fixing custody. *See Zuver v. Zuver*, 36 Iowa 190, 194–95 (1873). This duty would imply the power to order joint custody when justified. *Braiman*, 44 N.Y.2d at 589, 407 N.Y.S.2d at 450, 378 N.E.2d at 1020; *see* Annot., 92 A.L.R.2d 695, 700 (1963). Prior to the recent amendment to section 598.21, joint, or divided, custody was never forbidden by statute. Thus, the legislature has now simply placed its imprimatur upon joint custody.

This court historically has opposed divided custody, "except under the most unusual circumstances." *McCrery v. McCrery*, 258 Iowa 354, 358, 138 N.W.2d 876, 878 (1965); *see Mason v. Zolnosky*, 251 Iowa 983, 988, 103 N.W.2d 752, 755 (1960). Reasons cited for opposition include that divided custody is destructive of discipline, *Maron v. Maron*, 238 Iowa 587, 590–91, 28 N.W.2d 17, 19 (1947); that it tends to induce a feeling of not belonging to either parent, *Huston v. Huston*, 255 Iowa 543, 552–53, 122 N.W.2d 892, 898 (1963); and that in some instances it permits one parent to sow seeds of discontent concerning the other, which can result in a spirit of dissatisfaction in the children and their rebellion against authority, *Bennett v. Bennett*, 200 Iowa 415, 418, 203 N.W. 26, 27 (1925).

Courts in many states have shared this reluctance to divide custody, declaring that divided custody is to be avoided as not in the best interests of the children and that it will be sanctioned only under exceptional circumstances. *See, e. g., Utley v. Utley*, 364 A.2d 1167, 1170 (D.C.App.1976) ("A happy and normal family life is often impossible of accomplishment when a child of tender years is subjected to the frustrating experience of divided custody especially when in the process he is shifted from home to home, from city to city, or from one family environment to another."); *Lewis v. Lewis*, 217 Kan. 366, 372, 537 P.2d 204, 209 (1975) ("divided custody should be avoided whenever reasonably possible" as the "frequent shifting from one home environment to another could easily be detrimental to the emotional and physical well-being of any child"); *Knight v. Knight*, 419 S.W.2d 159, 159 (Ky.1967) ("[I]t is only necessary to say that such an arrangement would be greatly to the detriment of the children, because it would give them no fixed or permanent home, but rather keep them unsettled and on the move.") (quoting *Towles v. Towles*, 176 Ky. 225, 228, 195 S.W. 437, 438 (1917)); *Holley v. Holley*, 158 So.2d 620, 622 (La.Ct.App.1963) ("[D]ivided custody is injurious to the welfare of children."); *Dunavant v. Dunavant*, 31 Tenn.App. 634, 647–48, 219 S.W.2d 910, 915 (1949) ("So long as there is a divided custody there will probably be bickerings and disputes and a natural tendency on the part of the child to play one against the other, as well as for the claimants to seek by indulgences to curry favor with the child, if not to prejudice it against the other."); *Ponder v. Rice*, 479 S.W.2d 90, 94 (Tex.Civ.App.1972) ("Another rule of law which is deeply imbedded in our system of jurisprudence is one which condemns a decree of divided custody."); *Rickard v. Rickard*, 7 Wash.App. 907, 911, 503 P.2d 763, 766 (1972) (divided custody can have "serious detrimental effects to the welfare of children"); *see* Annot. 92 A.L. R.2d 695 (1963).

Experts in the field of divorce also have expressed opposition to joint or divided cus-

tody. It has been said that change and discontinuity threaten the child's emotional well-being; that joint custody requires the "shuttling back and forth" of children, leading to lack of stability in home environment; that children may become prey to severe and crippling loyalty conflicts. *Dodd v. Dodd*, 93 Misc.2d 641, 645–46, 403 N.Y. S.2d 401, 404 (Sup.Ct.1978) (citing J. Goldstein, A. Freud & J. Somit, *Beyond the Best Interests of the Child* 37–38 (1973) and 2 H. Foster & D. Freed, *Law and the Family* § 29.6A (Supp.1976)).[3]

In recent years there has been greater advocacy of joint custody. Proponents believe that joint custody benefits everyone involved. Joint custody serves to relieve one parent of some of the stresses of full-time parenting, which might otherwise engender resentment towards the children. *See Divided Custody, supra* note 3, at 60–61. For the otherwise noncustodial parent, joint custody gives recognition for prior performance of the parental duties and prevents the termination of gratifying interpersonal relationships. Without this recognition of his or her right to and desire for continuing contacts, eventual loss of interest in the children by this parent may result.[4] *See Dodd*, 93 Misc.2d at 646, 403 N.Y.S.2d at 404; Annot., 92 A.L.R.2d 695, 705 (1963). Advocates of joint custody also believe that the involvement of both parents in the child's life promotes the best interests of the child. It exposes the child to the knowledge, skills, experiences and affection of one more caring adult. *See Dodd*, 93 Misc.2d at 646, 403 N.Y.S.2d at 404; *Mullen v. Mullen*, 188 Va. 259, 272, 49 S.E.2d 349, 355 (1948). One commentator has suggested that, psychologically, the children deprived of contact with one parent may suffer feelings of loss akin to

mourning as well as uncertain or conflicting attitudes about men, who most often are the noncustodial parent. *Divided Custody, supra* note 3, at 59–62. Moreover, joint custody may mitigate the loss of security and feelings of rejection normally accompanying dissolution by approximating as closely as possible the former family relationship. *See Braiman*, 44 N.Y.2d at 591, 407 N.Y.S.2d at 452, 378 N.E.2d at 1022; *Dodd*, 93 Misc.2d at 645 & n.4, 403 N.Y.S.2d at 404 & n.4.

Few courts completely reject divided custody as a matter of public policy. Foster & Freed, *Joint Custody: A Viable Alternative?*, 15 Trial 26, 29 (May 1979). A number of courts have shown more tolerant, yet cautious, views towards joint custody. For example, in *DeForest v. DeForest*, 228 N.W.2d 919, 925 (N.D.1975), it was held that divided custody is not foreclosed by law if there is substantial evidence to support such a custodial arrangement. In *Johnson v. Johnson*, 526 S.W.2d 33 (Mo.App.1975), an order placing the custody of two young sons with their father, subject to weekend, certain holiday and summer vacations in the custody of their mother, was affirmed. In so doing, the Missouri Court of Appeals observed that the boys were doing well under the arrangement, that children should have the benefit of two parents, but it also opined "that frequent shifts of custody would be detrimental to the children's stability." *Id.* at 37. That same court has been noted for shunning the language of divided or joint custody but, in effect, condoning similar custodial arrangements under the label of "reasonable visitation." *See In re Marriage of Powers*, 527 S.W.2d 949, 952–53 (Mo.App.1975), *noted in* 42 Mo. L.Rev. 136 (1977). In *Knight*, cited above, the Kentucky court, although expressing

---

**3.** The psychological problems, as well as court decisions, relative to divided custody are also discussed in Note, *Divided Custody of Children After Their Parents' Divorce*, 8 J.Fam.L. 58 (1968) [hereinafter cited as *Divided Custody*].

**4.** *See also* Dembitz, *Beyond the Best Interests of the Child—A Review and Critique*, 29 Rec. A.B. City N.Y. 457, 458–59 (May/June 1974); Foster, *A Review of Beyond the Best Interests*

*of the Child*, 12 Willamette L.J. 545, 548, 552 (1976). In criticizing the view of noted psychologists that, based upon the psychological needs of the child, a custodial parent may be accorded veto power over visitation rights, both authors assert that the noncustodial parent has a legal right to an ongoing relationship with his or her children which should only be abrogated for good cause.

disapproval of divided custody as a long-term proposition, accepted such an arrangement on a temporary basis.[5]

Legal precedent and conflicting philosophies regarding joint custody notwithstanding, the ultimate determination still rests upon the best interests of the child. And those best interests must be founded upon the peculiar facts of each case. This has been nicely explained by Justice Shea in *Dodd*, 93 Misc.2d at 643, 403 N.Y.S.2d at 403:

> Joint custody is an appealing concept. It permits the Court to escape an agonizing choice, to keep from wounding the self-esteem of either parent and to avoid the appearance of discrimination between the sexes. Joint custody allows parents to have an equal voice in making decisions, and it recognizes the advantages of shared responsibility for raising the young. But serious questions remain to be answered. How does joint custody affect children? What are the factors to be considered and weighed? While the Court should not yield to the frivolous objections of one party, it must give thought to whether joint custody is feasible when one party is opposed and court intervention is needed to effectuate it. In the end, as in [e]very child custody decision, it is the welfare of the children which governs and each case will turn on its individual facts and circumstances.

## II. Joint Custody—Tests for Appropriateness

Several tests emerge from recent opinions and commentary for courts to consider in weighing whether any variety of joint custody arrangement is feasible in a given case:

(1) Is each parent fit and suitable as a custodial parent?

(2) Do the parents agree to joint custody, or is one or both opposed?

(3) Have the parents demonstrated that they are able to communicate and give priority to the child's welfare such that they are capable of reaching shared decisions in the child's best interests?

(4) Is there geographical proximity such that there will be no substantial disruption of the child's schooling, association with friends, religious training, or other routines?

(5) Is there similarity in the environment of each parent's home, or will the child be confronted with vastly different or potentially disruptive environmental changes?

(6) Is there any indication that the psychological and emotional needs and development of the child will suffer due to a particular joint custodial arrangement?

(7) Are the work hours and routines of both parents such that child care will be suitable with either parent?

(8) Is joint custody in accord with the child's wishes and does he or she not have strong opposition to such an arrangement?[6]

## III. Joint Custody—Is It Appropriate in This Case?

■ We now turn to the custody question before us: Whether trial court's award of joint custody is in the best interests of the Burham children? Their best interests are, of course, the first and governing consideration. Iowa R.App.P. 14(f)(15). In reaching this determination, it is our duty to examine the entire record de novo. *In re Marriage of Moorhead*, 224 N.W.2d 242, 244 (Iowa 1974). While we accord weight to the trial court's findings of fact because the trial judge heard and observed the witness-

---

**5.** Additional citation and discussion of decisions dealing with joint custody may be found in Foster & Freed, *supra* at 28–31.

**6.** *See* Foster & Freed, *supra* at 31. *See generally* Braiman, 44 N.Y.2d at 589–90, 407 N.Y.S.2d at 451, 378 N.E.2d at 1021 (tests 3, 4); *Dodd*, 93 Misc.2d at 644, 403 N.Y.S.2d at 403 (test 1); *id.* at 646–47, 403 N.Y.S.2d at 405 (tests 2, 3);

Bodenheimer, *supra* at 1011 (test 4); *Divided Custody, supra* at 63 (test 1); *id.* at 65–66 & n.40 (test 4); *id.* at 64 & n.32, 66 (test 5); *id.* at 64, 67 (test 6, indicating that the age of the child is a factor considered by some courts). *But see id.* at 66 (stating, contrary to test 4, that some courts consider distance a factor favoring divided custody).

es firsthand, we are not bound by them. *In re Marriage of Snyder*, 241 N.W.2d 733, 733 (Iowa 1976); *In re Marriage of Callahan*, 214 N.W.2d 133, 136 (Iowa 1974); Iowa R.App.P. 14(f)(7) (as amended in 1977).

■ At trial the custody of the parties' two daughters was bitterly contested. Because it would serve no useful purpose, we will refrain from spreading upon these pages the attacks made by each party as to the character and fitness of the other. Suffice it to say, neither appears to be as deficient as accused by the other, nor as worthy of custody as self-proclaimed. Trial court, in its decree, observed: "It is very plain from the record that the parents are better people than their conduct of recent years would indicate." In fashioning a joint and alternating custodial arrangement, trial court was attempting to salvage from the marital chaos some stability for the children and also afford them the benefit of the companionship and aid of both parents. Trial court reasoned:

> It becomes apparent that these fine young daughters need the full devotion of both parents to their best interests for the next six years. It is very doubtful that either parent can supply the emotional support the children need, afflicted as both parents are with myopia so severe as to disable these persons, at least temporarily, in their several roles as father and mother of the children. In this Court's view Susan and Mary Lee need the shared strength they get from each other in their familiar community among friends of longstanding in order to nurture and complete their development into good citizens during these next few years.

However, the home atmosphere was described at trial by a clinical psychologist as "having taken on the flavor of an 'armed camp.'" The battle rages on in the arguments advanced in this appeal, and both parties reject the feasibility of joint custody.

A mutual acceptance of joint custody and the ability to reach shared decisions in the children's best interests, the second and third tests for joint custody suggested above, are imperative. As stated in *Dodd*, 93 Misc.2d at 647, 403 N.Y.S.2d at 405, "The most ardent professional proponents of joint custody assume cooperation between parents and agreement about child rearing practices as basic requirements for joint custody." (Footnote omitted.) Because this case plainly fails the second and third tests, it also likely fails the sixth, which requires that the children not suffer emotionally or psychologically from joint custody. *Braiman*, 44 N.Y.2d at 590, 407 N.Y.S.2d at 451, 378 N.E.2d at 1021, observed, "As a court-ordered arrangement imposed upon already embattled and embittered parents, accusing one another of serious vices and wrongs, [joint custody] can only enhance familial chaos." Consequently, we believe that joint custody is, as both parties have asserted, untenable in this situation.

■ Despite our conclusion that joint custody is not workable in this case, this court henceforth will have no opposition to joint custody arrangements, either by stipulation or decree, which meet substantially those tests that we have set forth in division II.

### IV. *Fixing Custody in This Case*

■ It is now incumbent upon this court to fix custody in this case, applying the principles summarized in *In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974), which are recognized by both parties and need no repetition here. As previously mentioned, each party has attacked the parental qualifications of the other. Many witnesses were called to testify, including child guidance counselors, clergymen, relatives, neighbors and a clinical psychologist. From our examination of the record, we find that both Robert and Carla, notwithstanding individual shortcomings, are fit to be the custodial parent. Both Robert and Carla have demonstrated love and concern for the children and the ability to provide for their care and needs. The remaining question is thus, In whose custody will the long-range best interests of the children be better served?

We conclude that Robert should be awarded the custody of the two minor children, Susan and Mary Lee. Although Carla bore the primary responsibility for caring for the Burham children during their early years, events and circumstances as well as personal characteristics render her the less suitable custodian for her now teen-aged daughters. Carla has incurred health problems, partly as the result of accidental injuries. The evidence also discloses that she has difficulty living within a budget, which may impair her capacity to prudently provide for the material needs of the children.

Robert, since the onset of a serious marital conflict, has accepted greater responsibility for the care and discipline of the children, and he appears to increasingly give his daughters helpful attention. While he has always demonstrated fiscal responsibility, Robert has also acquired other necessary household management skills. His work as a chemistry professor permits him the freedom to be at home with the girls when they are not in school. It also appears that he has corrected some past intemperate beer-drinking habits. Consequently, although the issue is close and without a compelling preponderance in Robert's favor, we find that the long-range best interests of the children can be better served by giving Robert custody.

A factor considered in reaching our custody decision is the testimony of all three Burham children. Susan, thirteen years old and in the seventh grade when she testified, expressed her love for both parents, but she declared a preference to be with her father. Mary Lee, eleven and one-half years old and in the fifth grade at the time she gave her testimony, also said that she loved both her father and mother; her custodial choice, however, was her mother, although she was more adamant in her desire to remain with her sister, Susan. Melanie Lynn, then age twenty-two and married, favored her father as the custodial parent for her younger sisters. She explained that Robert established the better and more consistent discipline, that he was accustomed to making the important family decisions and that he was the more responsible parent.

According to Melanie Lynn, Robert had developed a good rapport with both Susan and Mary Lee.

 The preferences of the two minor children, while not controlling, *In re Marriage of Bowen*, 219 N.W.2d 683, 689 (Iowa 1974), are relevant and cannot be ignored, particularly Susan's preference in light of her age and apparent maturity. *See Winter*, 223 N.W.2d at 167. Susan's preference for her father is quite firm; Mary Lee's desire to be in the same household as Susan predominates over her choice of her mother as the custodial parent. We also adhere to the principle that no court should separate siblings absent good and compelling reasons. *E. g., In re Marriage of Wahl*, 246 N.W.2d 268, 270 (Iowa 1976); *Jones v. Jones*, 175 N.W.2d 389, 391 (Iowa 1970). Thus it is our conclusion that the two girls should be kept together and, in this instance, in the custody of their father.

It should also be noted that, in a docketed report to trial court, the attorney for the children stated a cautious preference for placing the custody of the children with Robert. *See Winter*, 223 N.W.2d at 167.

 A final reason for our decision is that it is more likely the girls will have substantial contacts with both parents if Robert has custody. Carla has made difficult and even prevented the exercise of visitation privileges by Robert during times when she has maintained the physical custody of the children. The converse does not appear to be true. In fixing custody in the past, this court has considered the willingness of each party to allow the children access to the other party. *See In re Petition of Ferguson*, 244 N.W.2d 817, 819 (Iowa 1976).

Visitation rights for Carla remain to be provided. Because we have no way of knowing current circumstances which affect visitation, such as work and school schedules and other activities of the parties and the children, those rights should be prescribed by trial court after further hearing. *See, e. g. Forsyth v. Forsyth*, 172 N.W.2d 111, 114 (Iowa 1969). In his brief and argument, Robert urges that he be

given custody, "with liberal visitation to Carla . . . ." We assume that Robert will stand by this advocacy of liberal rights of visitation for Carla so that the children may gain the benefits of companionship with both parents.

### V. *Modifications in Economic Provisions of Decree*

■ Carla asks that this court modify trial court's alimony and property settlement provisions. Those provisions were set out earlier in this opinion. We look to criteria enumerated in *Schantz v. Schantz*, 163 N.W.2d 398, 405 (Iowa 1968), except the consideration of fault, *In re Marriage of Williams*, 199 N.W.2d 339, 344–46 (Iowa 1972), as aids in arriving at an equitable determination of financial or property rights and obligations. In doing so, we conclude that there is a need for some modifications.

First, we direct that Robert should occupy and maintain the family home until Mary Lee reaches the age of nineteen. We agree with trial court that the home should then be sold and the net proceeds divided equally between the parties. Any delinquent mortgage payments, taxes or insurance premiums shall be charged against Robert's interest before he takes any of the proceeds. *See In re Marriage of Willcoxson*, 250 N.W.2d 425, 427 (Iowa 1977). The household furnishings and appliances shall also be divided or sold and the proceeds divided equally. In ordering this disposition, we are aware that Robert alone will be contributing towards building the equity in the home, to Carla's ultimate benefit as well as his own. In the meantime, however, Robert will enjoy the use of the home. In addition, we take into account the parties' comparative net gains from the sale of the home in our disposition of other property accumulated during the marriage.

That property consists of certificates of deposit Robert acquired and funds accumulated in his pension plan. Carla complains that trial court failed to make any provision for division of those two property interests. The record reveals the certificates of deposit were being depleted by litigation and living expenses. The pension plan, to which both Robert and his employer contribute, is tax-sheltered and disturbing it with any court-ordered distribution of all or any part of the fund would result in unfavorable income tax consequences. We deem it advisable and equitable, as apparently did trial court, to leave these assets in Robert's hands.

Next, we will not require Carla to pay child support at this time. Although both parents have a duty to support their children, this duty is not always imposed equally, but rather, according to each parent's ability to provide. *McDonald v. McDonald*, 183 N.W.2d 186, 189 (Iowa 1971). At least for the present, Carla will need all of her resources for her own care.

Finally, we find that Robert should pay alimony of $40 per week for Carla's support until either party dies or until Carla remarries. Robert possesses the greater earning capacity. His annual salary exceeds $19,000, and his salary is enhanced by fringe benefits. We recognize that Robert must also maintain the family home, meet the mortgage payments and support himself and the two girls. But Carla needs additional support. Her earning capacity is uncertain. While the evidence indicates she is capable of greater earnings if employed so as to use her secretarial skills and if she maintained regular employment, the job she held at the time of trial would yield her only about $5280 per year.

### VI. *Attorneys' Fees*

A. *Attorney for the minor children.* An allowance of fees is sought by the children's attorney, Gary Hassel. First, he requests an increase in trial court's award of $1200 for his trial preparation and participation. We do not believe that we would be justified in disturbing trial court's award in this case. Accordingly, we decline to do so.

■ Secondly, Mr. Hassel asks for fees for his services in this appeal. In addressing this request, we are confronted with the

question: Do the duties of an attorney appointed pursuant to section 598.12, The Code, to represent the interests of minor children of the parties to a dissolution action extend to participation in the appellate process? Section 598.12, beyond authorizing the appointment of an attorney to represent the parties' minor children, provides, "Such attorney shall be empowered to make independent investigations and to cause witnesses to appear and testify before the court on matters pertinent to the interests of the children." While the latter provision calls for services ordinarily connected with the preparation and trial of a dissolution action, we are satisfied that the authority granted the district court to appoint an attorney to "represent the interests" of minor children includes the authority to permit or direct continued representation on an appeal from the decree. Nonetheless, we believe that the duties and services of an attorney appointed to represent the minor children of the parties to a dissolution action usually will no longer be necessary once the decree of dissolution is entered. Hence, after the filing of this opinion, we advise that representation by court-appointed counsel for minor children in an appeal from a dissolution decree be on the authority and by direction of a district court order.

Mr. Hassel did not receive such authority in this case. However, we recognize the unfairness of applying the condition of trial court authorization retroactively. Mr. Hassel and other attorneys similarly situated likely believed it their duty to continue representation of the minor children through an appeal.

Aside from these considerations, in this case we find that there exist good and compelling reasons for allowing Mr. Hassel additional fees for his appellate services. Neither party has questioned Mr. Hassel's participation. He has performed useful services, including the filing of a brief. Upon review of Mr. Hassel's detailed statement of services rendered and time spent, we hereby award him a fee of $840, of which three-fourths shall be paid by Robert and one-fourth by Carla.

 B. *Carla's attorneys' fee claim.* Carla also seeks an allowance for attorneys' fees incurred by this appeal. Such fees are not allowed as a matter of right; any award must depend upon the financial circumstances and earnings of both parties. *In re Marriage of Peterson*, 227 N.W.2d 139, 142 (Iowa 1975). We find that Robert should pay $400 towards Carla's attorneys' fees. By so finding we do not fix the amount to be charged by her attorneys; we have only decided what portion Robert should pay. *Id.* at 143.

This case is remanded with directions to fix Carla's right of visitation and enter a decree in accordance with this opinion. Provisions of trial court's decree which have not been modified are affirmed.

Costs on appeal shall be taxed three-fourths to Robert and one-fourth to Carla.

MODIFIED, AFFIRMED and REMANDED.