# IN THE COURT OF APPEALS OF IOWA

No. 20-0932
Filed August 18, 2021

**QUAWIM I. GATES,**
     Plaintiff-Appellee/Cross-Appellant,

**vs.**

**SHUNTE N. JOHNSON,**
     Defendant-Appellant/Cross-Appellee.
_____

Appeal from the Iowa District Court for Des Moines County, Wyatt Peterson,

Judge.

A mother appeals a decree awarding physical care of their now-seven-year-

old daughter to the child's father. **AFFIRMED AS MODIFIED ON APPEAL;**

**AFFIRMED ON CROSS-APPEAL; AND REMANDED WITH DIRECTIONS.**

Timothy B. Liechty of Bell, Ort & Liechty, New London, for appellant.

Ryan D. Gerling of Cray Law Firm, PLC, Burlington, for appellee.

Considered by Bower, C.J., and Tabor and Ahlers, JJ.

**TABOR, Judge.**

Shunte Johnson appeals the physical-care provision of her decree with Quawim Gates. Johnson and Gates are the parents of Q.N.I.G., who was born in 2014. In a proceeding under Iowa Code chapter 600B (2018), Johnson and Gates offered conflicting versions of how their daughter came to live with Gates. The district court found Johnson more credible than Gates on her efforts to see Q.N.I.G. and his actions to impede that contact. Yet, despite that credibility finding, the court granted physical care to Gates and visitation to Johnson. The court then awarded Johnson attorney fees. Gates cross-appeals that award of attorney fees, arguing Johnson was not the prevailing party. Johnson contends if we modify the decree she will be the prevailing party. She also asks for appellate attorney fees.

Because the record shows Gates denied Johnson continuing contact with Q.N.I.G. without just cause, we find granting Gates physical care was not in the child's best interests. *See In re Marriage of Shanklin*, 484 N.W.2d 618, 619 (Iowa Ct. App. 1992). We thus modify the decree to place physical care with Johnson. We affirm the award of trial attorney fees. And we award reasonable appellate attorney fees to Johnson. Given the modification of physical care, we remand for the district court to issue a new visitation schedule and recalculate child support.

## I.      Facts and Prior Proceedings

Johnson and Gates were unmarried when Q.N.I.G. was born in January 2014. Their relationship ended about four months after their daughter's birth. During her first two years, Q.N.I.G. lived with Johnson, who encouraged Gates's connection with the child. Gates would visit the child at times. After their break-up, the relationship became somewhat contentious. According to Johnson, when

Q.N.I.G. was eleven months old, Gates took her for a visitation and did not bring her back for two weeks. Johnson filed a police report, and Gates returned Q.N.I.G., explaining that he was angry Johnson had been seen in a car with a different man.

But the biggest turning point came in March 2016. It was then that Johnson shared her plans to move with Q.N.I.G. to Gary, Indiana, to be closer to her family. In a series of text messages in mid-March, Gates demanded that Johnson allow him to see Q.N.I.G. Johnson agreed "against her better judgment" to let Q.N.I.G. spend the weekend with Gates. When he did not return the child on Sunday as they agreed, Johnson tried to call him and stopped by his house. But he would not respond. When she contacted the police, they told her there "wasn't really too much they could do because he was on the birth certificate so they couldn't force him to give her to me and that it was pretty much out of their hands." They recommended she hire an attorney. Johnson testified she tried to secure representation through legal aid but the assigned attorney did not help in regaining custody of Q.N.I.G. She also testified that she could not afford to pay the retainers requested by the private attorneys she contacted.

When Johnson communicated with Q.N.I.G.'s paternal grandmother on Facebook, the grandmother said she would try to get her son to return the child to Johnson. But that did not work. Neither did Johnson's continued calls and texts to Gates, which he blocked for months. Also in response to her persistence, in April 2016 Gates filed a self-represented petition for relief from domestic abuse, alleging Johnson called him four times in one day and left him voicemails

threatening to have her brothers "jump" him.[1]  Gates checked a box on the form asking for temporary custody of Q.N.I.G.  The district court dismissed the petition as failing to present a prima facie case of domestic abuse.

Faced with Gates's obstruction, Johnson asked the Burlington police several times during the summer and fall of 2016 to do welfare checks on Q.N.I.G.  Officers notified Johnson when they could determine Q.N.I.G. was in no danger at her father's residence.  But Gates objected to Johnson's efforts, posting this Facebook message:

> Who ever knows my daughter's so-called mother shunte johnson . . . tell the bitch and her bum ass cousins to stop fuckin with me and my baby stop sending the police to my house trying to catch this invisible criminal cuz one thing my fb friends real friends and family is going to tell them bum ass bitches is that im a damn good daddy so please fb friend and family please tell this bitch to leave us alone and let us be great.

When Johnson's lease was up in Iowa, she completed her anticipated move to Gary, Indiana.[2]  Johnson has two older children and wanted to be closer to her family who live in Chicago.  Plus the move shortened the distance to the home of the older children's father.[3]  Johnson also secured a job in Indiana working the front desk at a hotel.[4]

Meanwhile, Gates stayed in eastern Iowa, living and working for a stint in Davenport before moving back to Burlington.  He married Shatara in November

---

[1] Gates knew that Johnson did not have brothers and testified that he meant to say "cousins."

[2] Johnson qualified for low-income housing.  She testified that after she gave notice she could not rescind her Section 8 housing transfer.

[3] Both older children reside in Indiana.

[4] In 2019, Johnson was still at that job, earning ten dollars per hour.  She testified her employer allowed her flexible hours so that she could have weekend visitations with Q.N.I.G.

2016.  They later had a son together.[5]  Gates testified that Shatara also played a "motherly role" to Q.N.I.G. when he denied Johnson contact.  When asked at the custody hearing why he blocked Johnson's messages, he said: "I told her if you want to see your daughter, all you have to do is get a lawyer."[6]

In 2017, Johnson renewed her efforts to obtain legal assistance, contacting two different online services about preparing legal papers to challenge custody.  But she testified that she did not follow through because she believed she would still need to hire an attorney to file the papers.[7]  Also in 2017, Johnson communicated with Gates's brother, who offered to facilitate contact with Q.N.I.G.

But not until January 2018 did Gates allow Q.N.I.G. to have phone calls with Johnson.  When Gates set up a messaging program, Johnson immediately took the chance to have video chats with her daughter.

In September 2018, through counsel, Johnson petitioned for habeas corpus on behalf of Q.N.I.G.  Her petition alleged that Gates continued to "illegally restrain Q.N.I.G. and retain physical custody of her and deprive [Johnson] of all contact with Q.N.I.G."  On the day of the habeas hearing, Gates petitioned for physical care of Q.N.I.G.  The court combined the two actions and accepted submission by

---

[5] Gates also has two school-aged sons who live with their mother in Texas.  He has summer visitation with them.

[6] In the spring of 2017, Shatara sent Johnson a social media message saying,
Listen please stop calling my husband leaving messages pay for . . . a lawyer then have them contact US . . . she my baby now I take care of her . . . worry about them two other kids because [Q.N.I.G.] straight you had her now I'm raising her so continue to be an ass until you lawyer up.

[7] One such company quoted Johnson attorney fees of $1075 to complete her filings.

affidavits. In December 2018, the court granted Gates temporary physical custody, and set every-other-weekend visitation for Johnson.

The court held a hearing on the custody matters in August 2019. Both parents testified and both asked for physical care of Q.N.I.G. In June 2020, the court issued the decree granting physical care to Gates. The order maintained the every-other-weekend visitation and added summer and holiday interactions for Johnson. The court later ordered Gates to pay $7500 of Johnson's attorney fees.

Johnson appeals, contending the court erred in granting physical care to Gates. Gates cross-appeals, contesting the award of trial attorney fees.

## II.    Scope and Standard of Review

These custody proceedings were tried in equity, and we review equitable proceedings de novo. Iowa R. App. P. 6.907; *Phillips v. Davis-Spurling*, 541 N.W.2d 846, 847 (Iowa 1995). We examine the entire record and decide anew the factual and legal issues that the parties preserved and presented for review. *See In re Marriage of Williams*, 589 N.W.2d 759, 761 (Iowa Ct. App. 1998). While our review is de novo, we defer to the district court's factual findings and credibility assessments. *In re Marriage of Gensley*, 777 N.W.2d 705, 713 (Iowa Ct. App. 2009). We do so because that court has a chance to listen to the parties and watch them in person. *In re Marriage of Vrban*, 359 N.W.2d 420, 423 (Iowa 1984).

## III.    Discussion

In determining physical care, our governing consideration is Q.N.I.G.'s best interests. *See* Iowa R. App. P. 6.904(3)(o). Because Johnson and Gates were not married to each other, we operate under Iowa Code chapter 600B, rather than chapter 598 on dissolutions. But we apply the same legal framework to custody

and visitation matters involving unmarried parents as we do to those issues arising between parents who had been married to each other. Iowa Code § 600B.40(2) (cross referencing Iowa Code section 598.41).

Section 598.41(3) lists factors to consider when determining what care arrangement is in a child's best interests. *See In re Marriage of Hansen*, 733 N.W.2d 683, 696 (Iowa 2007) (paraphrasing those nonexclusive factors as "suitability of parents, whether psychological and emotional needs and development of child will suffer from lack of contact with and attention from both parents, quality of parental communication, the previous pattern of caregiving, each parent's support of the other, wishes of the child, agreement of the parents, geographic proximity, and safety"); *see also In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974) (listing similar circumstances to consider).

Most relevant to this proceeding are two competing considerations. The first is the pattern of caregiving. Our supreme court has recognized that "imposing a new physical care arrangement on children that significantly contrasts from their past experience can be unsettling, cause serious emotional harm, and thus not be in the child's best interest." *Hansen*, 733 N.W.2d at 697. This factor weighed most heavily for the district court. The court emphasized that "for three and a half of the five and a half years of the child's life, the child has lived almost exclusively with [Gates]." Gates echoes this factor in his brief, claiming he "has historically been the primary caretaker of the child."

The second, countervailing, factor is the ability of each parent to promote the other parent's relationship with the child. "The parent awarded physical care is required to support the other parent's relationship with the child. *Id.* at 700. And

a parent's denial of the child's opportunity for maximum continuing contact with the other parent, without just cause, is a significant factor in determining physical care. *See* Iowa Code § 598.41(1)(c). Johnson asserts she encouraged Gates's relationship with their daughter when Q.N.I.G. was an infant. By contrast, Gates failed to return the child after an arranged visit and "intentionally interfered and blocked [her] ability to have any relationship with Q.N.I.G. for over two years."

Indeed, the district court found Johnson more credible than Gates when comparing their testimony on her attempts to regain custody of Q.N.I.G. after March 2016 and his interference with those efforts. On this point, the court made explicit findings: "The court concludes [Gates] impeded [Johnson] from seeing Q.N.I.G." The court continued:

> [Johnson] made numerous text messages, phone calls, Facebook messages, calls for police service, and trips from Gary, Indiana[,] to Burlington, Iowa[,] all in an effort to see her child. [Gates] thwarted her efforts, blocked her calls and text messages, and even went so far to try to get a protective order to keep [Johnson] from contacting him. The court was not impressed with [Gates] in this regard.

We defer to those fact findings, especially the court's perception that Johnson was more believable than Gates. Yet despite those findings, the district court awarded Gates physical care for the sake of stability. We disagree with the primacy the court gave to that factor. Granted, stability matters. But it is not in a child's best interests for one parent to cut off the other parent's contact with their child—for years—and then profess that the continuity of caretaking favors their request for physical care. Despite the appearance of stability, Gates showed that he was not the parent most disposed to supporting the other parent's relationship with the child. Just the opposite.

*In re Marriage of Will* is instructive here. 489 N.W.2d 394 (Iowa 1992). In that case, the parents separated and the mother moved to California with their two sons without notice to the father. *Id.* at 396. He secured a temporary order for physical care, and she "immediately returned to Iowa." *Id.* The father continued to discourage contact, affection, and information exchanges between the boys and their mother. *Id.* at 398–99. But the supreme court did not look kindly upon the father's attempt to alienate their sons from their mother. *Id.* at 399 (upholding award of physical care to mother because she was more likely to assure the boys' "opportunity for the maximum continuing physical and emotional contact with both parents").

In drafting the decree, the district court distinguished *Will* in two ways, noting there: (1) the father's alienation occurred after the court issued a temporary order and (2) the mother moved back from California to maximize her contact with the sons. Neither difference is meaningful here. First, the fact that Gates abided by the temporary court order to allow Johnson visitation does not erase his long-term interference with her right to co-parent Q.N.I.G. *See Jacobs v. Houck*, No. 11-0116, 2011 WL 2556993, at *1 (Iowa Ct. App. June 29, 2011) (finding decision to grant physical care to father was supported by mother's denial of father's visitation following the couple's separation, forcing father to seek court intervention).

Second, unlike the mother's surprise removal of the children to California in *Will*, Johnson's move to Indiana was not "ill-advised" or without notice to Gates. In fact, the district court did not fault Johnson for leaving Iowa and found she had "good reason" for relocating. Johnson told Gates she was moving to be closer to her family who could help her with the children. In turn, the court noted Gates's

"efforts to have Q.N.I.G. in his care at this time [March 2016] were prompted largely because he learned" of Johnson's intent to move. But Gates's discontent with Johnson's planned move is not "just cause" for denying Q.N.I.G. contact with her mother. *See* Iowa Code § 598.41(1)(c).

"The ultimate objective of a physical care determination is to place the child in the environment most likely to bring [her] to healthy, mental, physical, and social maturity." *McKee v. Dicus,* 785 N.W.2d 733, 737 (Iowa Ct. App. 2010). It is our job to decide which physical care arrangement will serve Q.N.I.G.'s long-range best interests. *See In re Marriage of Burham*, 283 N.W.2d 269, 275 (Iowa 1979). In doing so, we must consider "the willingness of each party to allow the child[ ] access to the other party." *Id.* at 276. For more than two years, Gates limited Johnson's access to Q.N.I.G., cutting off every form of communication both in-person and remote. He blocked Johnson on his phone, social media, and even posted a message to friends and family encouraging them to tell Johnson to "leave us alone." Gates's refusal to support Johnson's relationship with Q.N.I.G. until required by court order is not reassuring. After due consideration of the district court's factual findings and its credibility determinations, in our de novo review we find Gates's disregard for Johnson's relationship with their daughter tips the scales in favor of placing Q.N.I.G.'s care with Johnson.

Before ending this opinion, we touch on sibling relationships. In most cases, we presume physical care decisions should not separate siblings. *See Will*, 489 N.W.2d at 398. That presumption includes half-siblings. *In re Marriage of Orte*, 389 N.W.2d 373, 374 (Iowa 1986). Q.N.I.G. has half-siblings in both households: Gates has a son born in 2018, and Johnson has a son, D.P., born in 2002 and a

daughter, J.P., born in 2010. D.P.—then sixteen—testified at the custody hearing that Q.N.I.G. has a bond with him and J.P. He described how sad Q.N.I.G. was on the way back to Iowa from weekend visits. Thus, the presumption against separating siblings does not detract from our decision to place physical care with Johnson.

Because we modify the custody order granting Johnson physical care and making her the prevailing party, we affirm the award of trial attorney fees raised in Gates's cross-appeal. *See* Iowa Code § 600B.26. Johnson also requests appellate attorney fees. "An award of appellate attorney fees is not a matter of right, but rests within our discretion." *In re Marriage of Berning*, 745 N.W.2d 90, 94 (Iowa Ct. App. 2007). "We consider the needs of the party making the request, the ability of the other party to pay, and whether the party was required to defend the district court's decision on appeal." *Id*. We also note Johnson is the prevailing party. After considering these factors, we conclude Gates should pay Johnson's appellate attorney fees and remand to the district court for a determination of a reasonable amount. The remand should also include issuance of a new visitation schedule and recalculation of child support.

**AFFIRMED AS MODIFIED ON APPEAL; AFFIRMED ON CROSS-APPEAL; AND REMANDED WITH DIRECTIONS.**