In re the MARRIAGE of Sandra Ann
KRAMER and Gerald Kramer

Upon the Petition of Sandra Ann
Kramer, Appellant,

and concerning, Gerald Kramer,
Appellee.

No. 63498.

Supreme Court of Iowa.

Oct. 15, 1980.

John W. Logan, Council Bluffs, for appellant.

Kenneth Sacks of Perkins, Sacks & Hannon, Council Bluffs, for appellee.

Considered by REYNOLDSON, C. J., and LeGRAND, McCORMICK, McGIVERIN, and SCHULTZ, JJ.

McCORMICK, Justice.

This appeal involves a child custody dispute between the parents of a four-year old girl and a three–year–old boy. The trial court awarded custody of the children to their father, respondent Gerald Kramer (Jerry). The mother, petitioner Sandra Ann Kramer (Sandi), appeals. She contends that the trial court erred in basing the decree on racial considerations and, in any event, in refusing to award custody of the children to her. We reject the trial court's consideration of race. Based upon our de novo review of the record, however, we affirm the decree.

Jerry and Sandi were married in 1971. Their children are Amy, born February 18, 1976, and Donald, born February 6, 1977.

The parties separated in November 1978, and the dissolution case was tried in February 1979. Sandi's evidence included testimony of herself, her mother, and her sister. Jerry offered the testimony of himself, his mother, three friends of the couple, and two babysitters. The trial court's decree was entered April 5, 1979, and this appeal followed.

I. *The equal protection issue.* The parties did not inject the issue of race into the case. Instead, the issue was raised by the trial court in its decree. Evidence had been received concerning Sandi's relationship with another man. On a morning shortly after the parties separated, Jerry returned to the home and observed the man sleeping on the couch. When Jerry questioned Sandi about the relationship, she acknowledged she had been seeing the man and had sexual intercourse with him two or three times. One of those occasions was the night before. Jerry said Sandi told him the man moved from her bed to the couch when Amy came into the bedroom during the night. The only reference to race in the whole record is in Jerry's description of the man he saw on the couch as a "black man." We assume, based on what is said in the decree, that Jerry and Sandi are white. Sandi testified she did not intend to marry the man involved and had not seen him for five or six weeks.

The trial court decree included the following language:

From the evidence produced in the case, it is not completely clear as to whether or not the petitioner still has a relationship going with the male "acquaintance"; however, it is obvious that for a period of time she did have a relationship going with him. It is undisputed that he is black, and while the Court cannot assess that as fault in this case, the subjecting [of] the children to a bi racial relationship and allowing such a relationship to exist in the presence of the children is not in their best interest and is going to make their lives in the future much more difficult. It is therefore the opinion of the Court that the care, custody and control

of said minor children should be granted to the Respondent herein.

Thus the trial court found that the fact Sandi's male friend was black was decisive of the custody issue. The record contains no evidence to show that the difference in race would affect the welfare of the children. The trial court's conclusion is based solely on the fact such difference exists.

Sandi contends that the trial court decree denied her equal protection of the law under U.S.Const. amend. XIV. She also contends that race should not be a factor in custody decisions.

Sandi cites three cases in support of her equal protection attack. They are *McLaughlin v. Florida,* 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964); *Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); and *Beazley v. Davis,* 92 Nev. 81, 545 P.2d 206 (1976). In *McLaughlin,* the Supreme Court struck on equal protection grounds a Florida statute which made biracial cohabitation of unmarried persons punishable but did not proscribe cohabitation by unmarried persons of the same race. In *Loving,* the Court struck Virginia's antimiscegenation statutes on the same grounds. In *Beazley,* the Nevada Supreme Court found a denial of equal protection in a trial court decree refusing to change custody of children from their black father to their white mother on the ground they would suffer emotional trauma in a home with a white stepfather.

Two cases involving adoption statutes also lend some support to Sandi's constitutional argument. In *In re Gomez,* 424 S.W.2d 656 (Tex.Civ.App.1967), the court struck a Texas statute proscribing biracial adoptions as violative of equal protection rights under the state constitution and the fourteenth amendment. A three-judge federal district court struck a similar Louisiana statute on the same ground in *Compos v. McKeithen,* 341 F.Supp. 264 (E.D.La. 1972).

All these cases recognize that classifications based on race are suspect and thus subject to strict scrutiny. They also demonstrate that state regulations of personal relationships in which race is automatically a determinative factor have difficulty surviving equal protection analysis.

 We will not, however, reach a constitutional issue if a narrower ground is decisive. *Ehlinger v. Mardorf,* 285 N.W.2d 27, 28 (Iowa 1979). In the present situation we believe the result which Sandi seeks under the Constitution is commanded by long-standing principles governing child custody adjudication. We recently reiterated that "child custody cases are to be decided 'upon what the evidence actually reveals in each case, not upon what someone predicts it will show in many cases.'" *In re Marriage of Tresnak,* 297 N.W.2d 109, 112 (Iowa 1980). Just as no assumptions are automatically warranted based on gender of parent or child, we believe no assumptions are automatically warranted by racial identity. We emphatically reject the idea that parent child relationships are to be dictated by unsubstantiated judicial predictions concerning the effects of racial prejudice in the community. Community prejudice, even when shown to exist, cannot be permitted to control the makeup of families.

 We adhere to the criteria for child custody adjudication delineated in *In re Marriage of Winter,* 223 N.W.2d 165, 166–67 (Iowa 1974). Race is not necessarily relevant to any of them. We are well aware of the existence of racial tension in this multiracial society. Yet where such tension exists it should not affect decisions regarding custody unless it has some demonstrated relevancy to one or more of the *Winter* criteria. The showing of relevancy will depend on the evidence in the particular case. The mere existence of prejudice and tension in the community are not enough. As stated in *Commonwealth ex rel. Lucas v. Kreischer,* 450 Pa. 352, 356, 299 A.2d 243, 246 (1973): "'[I]n a multiracial society such as ours racial prejudice and tension are inevitable. If ... children are raised in a happy and stable home, they will be able to cope with prejudice and hopefully learn that people are unique individuals

who should be judged as such.'" Even when race has some demonstrated relevancy to one or more of the *Winter* criteria, the criteria are to be weighed together in determining the custody award which will serve the best interests of the child.

Custody and adoption cases from other jurisdictions are in accord. *See Drummond v. Fulton County Department of Family & Children's Services,* 563 F.2d 1200, 1205 (5th Cir. 1977) *cert. denied,* 437 U.S. 910, 98 S.Ct. 3103, 57 L.Ed.2d 1141 (1978) (recognizing that the automatic use of race as a factor in adoption cases is barred); *In re Adoption of a Minor,* 228 F.2d 446, 448 (D.C. Cir. 1955) ("There may be a reason why a difference in race or religion may have relevance in adoption proceedings. But that factor alone cannot be decisive in determining the child's welfare."); *Langin v. Langin,* 2 Ill. App.3d 544, 547, 276 N.E.2d 822, 824 (1971) ("race alone cannot outweigh all other factors and be decisive on the question of custody"); *In re H.,* 37 Ohio Misc. 123, 130, 66 Ohio Op.2d 178, 182, 305 N.E.2d 815, 819 (1973) ("Certainly then Carol's marriage to a black man is of no significance in this case and does not support the neglect complaint,"); *Tucker v. Tucker,* 14 Wash.App. 454, 456, 542 P.2d 789, 791 (1975) (holding that race cannot be decisive of a custody question). *See generally,* S. Grossman, *A Child of a Different Color: Race as a Factor in Adoption and Custody Proceedings,* 17 Buffalo L.Rev. 303 (1968).

■ Under the present record, the only relevancy of Sandi's relationship with her male friend is the possible harmful effect a nonmarital sexual relationship may have on the emotional and moral welfare of her children. The man's race has no bearing on that issue. *See Commonwealth ex rel. Myers v. Myers,* 468 Pa. 134, 144, 360 A.2d 587, 591–92 (1976) ("Thus, Fred's primary concern in instituting his custody action, the racial problems he contends his children might have, is not relevant in denying Pandora custody. He produced no evidence that Pandora's relationship with Thompson . . . adversely affected the children."). Therefore, we hold that the trial court erred in basing its custody decision on racial considerations in the present case.

II. *The merits of the custody issue.* In our de novo review of the record, we give no effect to evidence of racial identity. This also happens to be the way the parties tried the case.

The custody issue is very close and difficult. For the most part, both parents have been serious and responsible custodians. They are devoted and loving parents. Nevertheless, each has engaged in conduct which portends harm to the children. The children do not yet seem to have been adversely affected. As usual, however, the future can be predicted based only on what has happened in the past.

Jerry earns approximately $12,000 a year as manager of a shoe repair business in Omaha. He has been steadily employed and is a hard worker. In fact, his long hours combined with a penchant for gambling, bowling, golf and poker seriously affected the time and attention he devoted to the children during the marriage. Moreover, despite his steady employment, he has not been financially responsible. He thought hospital insurance was too expensive. As a result, the parties incurred large medical debts for childbirth and other hospitalizations. In a single weekend in 1975 he lost approximately $3000 betting on football games. This included $2000 which the parties had saved toward a downpayment on a house. Even at the time of trial, he seemed to see nothing wrong with losing $20 a weekend in gambling. We would have more confidence in his ability to care for the children if he recognized he cannot afford to gamble. It is encouraging that during the period he had custody of the children before trial he had reduced his working hours and recreational activities.

■ Sandi's problem appears to be one of emotional stability. The trial court perceptively recognized that her affair was a product rather than a cause of the marital disharmony. Of course, her moral misconduct in the presence of the children is a circumstance to be considered in assessing the custody issue. *See In re Marriage of*

*Morton*, 244 N.W.2d 819, 822 (Iowa 1976). Sandi had been employed for two years after the marriage and had resumed full-time employment as a beautician in August 1978 to help pay family debts. Whereas Jerry was gone a great deal during the day on weekends, she was occasionally absent from the home for long hours during weekend evenings. She was unhappy and depressed and seemed to be searching for a more carefree life-style, without regard to its effect on the children. Commendably, she had sought and received psychiatric care for her emotional problems. However, witnesses who were friends of both parties expressed reservations about Sandi's ability to care adequately for the children.

The children are normal and healthy. Evidence showed that Amy displayed some nervousness and signs of emotional insecurity during the final months of the marriage. During the period before trial when the children were with Jerry, she became more relaxed and openly affectionate. Amy seems to need attention more than Donald. Both children have a close relationship with each parent.

Grandparents will play a large role in assisting with the children whichever parent receives custody. Jerry and the children were living with his parents at the time of trial, and Sandi proposed to move in with her mother if she received custody. In each situation the grandparents are supportive and would provide valuable if not indispensable assistance.

On the whole record, we conclude that Jerry is the parent who "can minister more effectively to the long-range best interests of the children." *Winter*, 223 N.W.2d at 166. We agree with the trial court that Sandi should be accorded liberal visitation rights.

Sandi has applied for an award of attorney fees for the appeal. Without determining the total amount of her fee, we order that Jerry pay $500 toward the fee as well as costs.

AFFIRMED.