In re the MARRIAGE OF Gay MIKEL-SON and Thomas Lee Mikelson upon the petition of Gay Mikelson, Appellee,

and

Concerning Thomas Lee Mikelson, Appellant.

No. 64941.

Supreme Court of Iowa.

Dec. 17, 1980.

Tom Riley of Simmons, Perrine, Albright & Ellwood, Cedar Rapids, for appellant.

Sharon A. Mellon of Mellon & Spies, Iowa City, for appellee.

Emmit J. George, Iowa City, for amicus curiae, Iowa City Chapter of NAACP.

Considered by REYNOLDSON, C. J., and HARRIS, McCORMICK, ALLBEE, and LARSON, JJ.

McCORMICK, Justice.

The question here is whether the trial court erred in refusing in part to modify child custody and child support provisions of a dissolution decree. Respondent Thomas Lee Mikelson asked that the decree be modified to award him custody of the three children of the parties. Petitioner Gay Mikelson did not oppose transfer of custody of the parties' 14–year–old son, Dana, but resisted a change in custody of the younger two children, Joel, then 11, and Kelly, then 10. The trial court modified the decree to award custody of Dana to Tom and reduced Gay's child support award accordingly but otherwise left the decree intact. In this appeal, Tom contends the court should have awarded him custody of all three children and, in any event, should have ordered Gay to pay child support for his care of Dana. We affirm the trial court.

Tom and Gay were married in 1958. Dana was born in 1965. Joel, who was born in 1968, and Kelly, who was born in 1969, were adopted by the parties as babies. Tom and Gay are Caucasion, but Joel and Kelly each had one black and one white parent.

Tom has been minister of the Unitarian Universalist Society in Iowa City since September 1971. His income is approximately $20,000 annually, for nine months of work. Gay is a primary school teacher by education and has been employed for several years as administrative assistant in the Urology Department at University Hospital. Her income is approximately $13,000 annually.

The marriage was dissolved on April 14, 1978. Pursuant to a stipulation of the parties, Gay was awarded custody of the children. Tom was granted reasonable rights of visitation including one month each summer. He was ordered to pay support of $133.33 per month for each child.

Dana left his mother's home and moved to Tom's home in December 1978. By agreement of the parents, Tom stopped paying child support for Dana. This situation was ratified in the unresisted portion of the modification order entered in the present proceeding.

■ I. *The custody issue.* The principal question for us, as it was for the trial court, is whether Tom established by a preponderance of evidence that conditions since the dissolution decree was entered have so materially and substantially changed that the children's best interests make it expedient to award their custody to him. The changed circumstances must not have been contemplated by the trial court when the decree was entered. They must be more or less permanent or continuous, not temporary, and must relate to the welfare of the children. *Hobson v. Hobson*, 248 N.W.2d 137, 139–40 (Iowa 1976). This heavy burden stems from the principle that once custody of children has been fixed it should be disturbed only for the most cogent reasons. *See In re Marriage of Melton*, 256 N.W.2d 200, 205 (Iowa 1977).

Tom's application to modify the decree was filed in November 1979. The application was tried during a five–day period in February 1980. Twenty–three witnesses testified and the record contains more than one thousand pages of transcript. Among the witnesses were the parties, their son Dana, a number of relatives and friends, a school principal, a Family Services Agency counselor and a child psychologist. After having heard the evidence, the trial court entered its order in May 1980, changing Dana's custody to Tom as agreed by the parties but refusing to change the custody of Joel and Kelly.

■ Tom seeks reversal of the denial of his application for custody of the two

younger children. He alleges nine circumstances which he contends constitute the requisite basis for modification of the original custody decree. These circumstances involve four main subjects: Gay's fitness, Tom's fitness, the children's preference and separability of the children.

In assailing Gay's parental fitness, Tom asserted she neglected the children, engaged in moral misconduct in their presence, showed insufficient concern about Joel's progress in school, failed to further the children's religious training, and did not adequately assist them in developing a positive view of their racial identity. He contended his own ability to minister to the children's needs was enhanced by his remarriage and he was a better custodian than Gay. He also alleged Joel and Kelly expressed a preference to be in his custody, and he argued they should not be separated from Dana.

Reciting the evidence in detail would serve no useful purpose. We believe it is sufficient to discuss the significant conclusions which we have made in our de novo review.

The parents seem very much like the kind of people they were when they agreed Gay should have custody of the children. They each have tried to be good parents and have largely succeeded. Nevertheless, Tom's visitation with the children has been a source of constant friction. This friction has essentially been a struggle over custody.

Gay has kept the children in the same neighborhood and school they were in when the marriage was dissolved. She engages in a broad range of activities with the children, assists Joel with his spelling, assigns responsibilities to the children, sets reasonable limits on their behavior and shows considerable interest in their well–being. Her principal deficiencies appear to be her acquiescence in the children's desire to be left without a babysitter when she was gone from the home, indiscreet behavior in sexual liaisons with two men, and a short temper.

To her credit, she has been careful not to malign Tom in the presence of the children and generally has been supportive of his parental role. However, her hostility toward Tom has been obvious to the children. The parents have competed for their loyalty ever since the marriage ended. Unfortunately, Gay and Dana have become alienated. Although Gay has some responsibility for this event, it appears to have resulted in part from forces beyond her control.

Shortly after the decree was entered, Tom regretted having agreed to Gay's custody of the children. He married Pat Sheppard, a divorcee with one child, within two months of the divorce. Once he established his home after the remarriage, he wanted his three children to live there with him.

He sought maximum visitation. He and Dana had long telephone conversations prior to Dana's departure from Gay's home in December 1978 to live with Tom. Tension grew between Dana and Gay when Dana demanded that Gay turn over to him certain bedroom furniture, pay child support to Tom for his care, and consider letting Tom have custody of Kelly. Gay did not believe these ideas originated with Dana, and she did not think it was right for her to discuss them with him.

When Joel balked at visitations with Tom in September 1978, Tom proposed counseling with child psychologist Rhoda Harvey, to which Gay agreed. The counseling expanded to include Dana and Kelly. Tom encouraged Kelly to express her feelings about matters including where she would like to live. On one occasion he told her she would have to decide where she would live. With Dr. Harvey's help, additional visitation was agreed upon in December 1978. Previously the children had been spending alternate weekends with Tom. Now they were permitted to go to Tom's home after school, provided they let Gay know they were doing so and were home by suppertime. If they wished to do so, they also could spend every other Wednesday night with Tom. During visitations, Tom listened to the children's grievances and discussed Gay's faults with them. When Dr. Harvey criticized Tom's undermining of Gay's authority, Tom rejected her advice. He insist-

ed Kelly wanted to live with him and Dr. Harvey did not understand the problem.

When Tom picked Kelly up after school, he considered it visitation. When Kelly came to his home by bus, he said it was from a desire to come and live with him. On those occasions, Tom did not consider himself bound by the visitation agreement. This was because Kelly thought she was "running away" from her mother. Without consulting Gay, he waited until approximately 8:00 p. m. to take Kelly home on those evenings.

Through his ministry Tom became acquainted with some black persons in Iowa City. He joined the local chapter of the NAACP and became its vice–president. He believed Joel and Kelly should associate with black persons in order to establish a sense of their own black identity and to appreciate black values.

Tom expressed concern about Joel's progress in school. He scored lower on his fifth grade basic skills test in math than he had in third grade. Tom did not believe Gay cared enough about this problem, and he wished to work with Joel on it.

Tom's principal deficiencies appear to be his lack of support of Gay's rights as custodial parent and his use of visitation as a device to wean the children away from their mother. Tom has treated custody an an open question even though it was settled in the decree terminating the marriage. This attitude has contributed to the hostility and mutual distrust which exists between Tom and Gay. It has also placed the children in the midst of a tug–of–war for their loyalties. We have disapproved such conduct before. See Crary v. Curtis, 199 N.W.2d 319, 321 (Iowa 1972). We now do so again.

Joel and Kelly are relatively well adjusted in spite of the tension and conflict between their parents. Joel was described by his school principal as a slow learner who is behind his class academically. However, the principal believed Joel was achieving in accordance with his ability. He testified it would be a mistake to attempt to try to make Joel learn faster. Joel was said to be sensitive, athletic, competitive and dependent on peer relationships.

Kelly is bright and adaptable. She is doing well in school. After the filing of the application for modification, she stopped "running away" from her mother's home.

Tom's charges relating to Gay's fitness relate in part to conditions which existed at the time the decree was entered. Her alleged misconduct is not materially different from conduct he engaged in and advocated during the marriage. Any changes since that time which were not contemplated by the court are not substantial enough to support modification of the custody award. Even though we do not condone Gay's leaving the children unattended and her sexual indiscretions, these circumstances do not alone justify changing custody. See In re Marriage of Morton, 244 N.W.2d 819, 822 (Iowa 1976). We do not believe Tom proved his assertions about Gay's lack of concern about Joel's learning problem, neglect of the children's religious training, and insensitivity to their black identity.

Her attitude toward Joel's learning is realistic and supportive. She has encouraged the children's spiritual training, although she has been understandably reluctant to take them to Tom's church. Even though she has not made friends among black people in Iowa City, she has long been concerned about helping the children recognize, understand and appreciate their racial identity. The children have black friends at school and have met others at Tom's home during visitation periods. Gay would like to make friends among Iowa City's small black population and is pleased that Tom has done so. On balance, she has done well for the children and has been a good parent.

The remarriage and new home which Tom offers are matters which were foreseeable when the decree was entered and do not establish a basis for changing custody. See In re Marriage of Wagner, 272 N.W.2d 418, 421 (Iowa 1978). He is to be commended for having stabilized his life and for having what appears to be a good home, but those circumstances do not demonstrate a

compelling basis for changing custody. Nor do we believe custody should be changed because of Tom's sensitivity to the issue of the children's racial identity.

We recognized in *In re Marriage of Kramer*, 297 N.W.2d 359, 361–62 (Iowa 1980), that race is not a controlling factor in child custody adjudication. It has relevancy when it affects one or more of the criteria delineated in *In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974). However, all the *Winter* criteria are to be weighed together in making custody decisions.

In the present case, impressive evidence was received concerning special problems in transracial adoptions. Black children adopted by white parents risk a loss of identity which affects their self–esteem, their ability to cope with community prejudice, and their relationship as adults with black peers. In addition, they risk being deprived of the enriching influence of black culture. *Cf. Doan Thi Hoang Anh v. Nelson*, 245 N.W.2d 511, 518 (Iowa 1976) (recognizing that separation of Vietnamese child from his mother would probably result in alienation from his cultural and racial roots). These parents were aware of these risks when they adopted Joel and Kelly. They were sensitive to these problems during their marriage and each has remained sensitive to them since its dissolution.

On one occasion several years earlier, when Kelly was belittling a black child, Gay confronted the issue head–on. With the help of the mother of the other child, she helped Kelly recognize her own racial identity. Gay has not made the extra effort which Tom has to befriend black persons in order to assure the children a greater opportunity to associate with them. This, however, is more due to lack of opportunity than lack of sensitivity. Tom's efforts are laudable and contribute positively to the emotional and social well–being of the children. Nevertheless, this is only one of several factors bearing on the custody issue.

Tom asserts Joel and Kelly have each expressed a preference to be in his custody. This assertion is based largely on the testimony of Joe Mowrer, director of counseling of Family Services Agency in Cedar Rapids. Tom took the children to Dr. Mowrer for evaluation in preparation for the modification proceeding. Dr. Mowrer said both children had expressed that preference to him. He was not sure what motivated Joel's decision but was persuaded Kelly independently made her choice. In contrast, Dr. Harvey said Joel did not state a preference to her but said he did not want to go to his father's home. She testified Kelly told her she would like to live with both parents. She thought Kelly's ambivalence may have been influenced by a desire to be in her father's home to protect her interests because of his remarriage.

In view of their age, the parental influences on their decisions, and the ambiguity of the evidence, the children's alleged preferences are entitled to little weight.

Tom also relies on the principle that siblings should not be separated except for good and compelling cause. *See In re Marriage of Burham*, 283 N.W.2d 269 (Iowa 1979). The trial court's order has the effect of separating Dana from Joel and Kelly. The evidence shows Joel and Kelly are extremely close and should not be separated from each other. It also shows it is in Joel and Kelly's best interests to remain with their mother. Yet she makes no claim for custody of Dana, and Dana will stay with his father. In these circumstances, good and compelling cause exists for permitting separation of siblings. *See In re Junkins*, 240 N.W.2d 667, 668 (Iowa 1976).

To the extent that Tom has shown a change in circumstances since the decree was entered, those changes do not rise to sufficient proof of need for modification of the decree to award him custody of Joel and Kelly.

The trial court did not err in refusing to modify the decree in that respect.

■ II. *The child support issue.* Tom contends that Gay should be ordered to pay him child support for Dana. The trial court reduced Tom's child support obligation by one–third when it modified the decree to

give Tom custody of Dana. In view of the disparity in income of the parties, the court's order is equitable. Tom earns fifty percent more for nine months' work than Gay does in a year. It was not unreasonable for the court to refuse to require Gay to pay support for Dana.

We find no basis to interfere with the order of the trial court.

AFFIRMED.