In re the MARRIAGE OF Bruce GRA-VATT and Sandra Sue Gravatt, Upon the Petition of Bruce Gravatt, Petitioner-Appellant,

and

Concerning Sandra Sue Gravatt, Respondent-Appellee.

No. 84–369.

Court of Appeals of Iowa.

May 10, 1985.

David S. Good of Nazette, Hendrickson, Marner & Good, Cedar Rapids, for petitioner-appellant.

Kevin J. Visser of Moyer & Bergman, Cedar Rapids, for respondent-appellee.

Heard by DONIELSON, P.J., HAYDEN, and SACKETT, JJ.

SACKETT, Judge.

Petitioner, Bruce Gravatt, appeals from the trial court's denial of his application to modify the custody provision of a dissolution decree.

The marriage of petitioner, Bruce Gravatt, and respondent, Sandra Gravatt Burau, was dissolved in 1979. The parties' three children were placed in Sandra's custody. Both parties have remarried. At the time of the modification hearing Bruce resided in Center Point, Iowa, with his wife, Cynthia, and her three children from a prior marriage, twins Johannah and Jennifer, age fourteen, and Mia, age eleven. Sandra and husband Walter live in Winfield, Illinois, a suburb of Chicago. They have a daughter, Destiny, who was twenty-two months old at the time of the modification hearing. The three children whose custody is at issue in this case are Travis, Brandy, and Wesley, ages ten, nine, and five, re-

spectively, at the time of the modification hearing.

At the end of the children's 1983 summer visitation with Bruce, he filed an application to modify the dissolution decree to grant him custody of the parties' three children. He alleged that the children had developed a condition known as psychosocial dwarfism while living in Sandra's home. This condition is characterized by a failure to grow at a normal rate in a certain environment. The court placed temporary custody with Bruce in order to determine whether the children would grow faster in a different environment.

After a hearing the trial court entered a decree in February of 1984, denying Bruce's application for permanent custody. The trial court held that Bruce had not met his burden of showing that the children were suffering from psychosocial dwarfism and had not shown that he could minister to the children's needs more effectively than could Sandra.

On appeal Bruce argued the trial court should not have accepted a report from the attorney for the minor children after the close of the evidence without allowing further evidence to be presented.

We addressed this issue and held that the trial court utilized the attorney for the minor children in a manner not contemplated by Iowa Code section 598.12(1) and the supreme court's decision in *In re Marriage of Joens*, 284 N.W.2d 326, 329 (Iowa 1979). We remanded the case to the trial court for the limited purpose of allowing the parties the right to examine the attorney for the children and to offer evidence which may refute his report and testimony. *In re Marriage of Gravatt*, 365 N.W.2d 48, 49 (Iowa Ct.App.1985). We requested the trial court make a supplemental ruling based on this additional proceeding. After holding the hearing in compliance with our remand, the trial court entered a supplemental ruling affirming its original decision. A transcript of the proceeding on remand was forwarded to us and has been considered along with the evidence taken at the modification hearing.

Our review of this proceeding in equity is de novo. Iowa R.App.P. 4. We give weight to the findings of fact of the trial court, especially where the credibility of witnesses is concerned; however, we are not bound by them. Iowa R.App.P. 14(f)(7).

The question for us, as it was for the trial court, is did Bruce show by a preponderance of the evidence that there has been a substantial change in circumstances, since the date of the dissolution decree, materially affecting the children's welfare. And further, did he show the changed circumstances were permanent and continuous in nature and not contemplated by the court when the dissolution decree was entered. *See In re Marriage of Mikelson*, 299 N.W.2d 670, 671 (Iowa 1980). Bruce's burden is heavy because once custody is fixed it must be disturbed for only the most compelling reasons. *See In re Marriage of Melton*, 256 N.W.2d 200, 205 (Iowa 1977).

The most paramount consideration is the best interest of the children. Iowa R.App.P. 14(f)(15).

We considered the evidence in light of the criteria in *In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974) and Iowa Code section 598.41 and determine custody should be transferred to Bruce.

We will first discuss our review of the medical evidence.

Dr. Mary Nelson, M.D., a family practitioner in Cedar Rapids saw the Gravatt children on a regular basis; and based on data she collected, she felt there might be a problem and the children were referred to Dr. Robert Thompson at the University Hospitals in Iowa City. Dr. Thompson's qualifications are impressive. Following his graduation from the University of Iowa Medical School, he worked as a professor at Johns Hopkins University. In addition to his teaching at Johns Hopkins, he studied under the persons accepted or recognized as identifying and defining psychosocial dwarfism. Thompson also specialized

in pediatric endocrinology, which includes the study of growth problems in children, and was one of the first group certified in endocrinology by the American Board of Pediatrics.

Dr. Thompson testified that he had seen approximately thirty patients suffering from psychosocial dwarfism. He further testified that the disorder is characterized by a condition in which children fail to grow at a normal velocity in one environment, but in a different environment will grow at an accelerated velocity. The pioneer work in this area was done in 1967. The children studied at that time were at the low end of the growth percentile, had intelligent quotients under 80, were antisocial and exhibited bizarre eating and drinking habits. Dr. Thompson testified that these symptoms were characteristic of extreme cases and were not prerequisites to a diagnosis of psychosocial dwarfism.

Dr. Thompson examined the Gravatt children in June, August, and December of 1983, and February of 1984, shortly before the hearing. On each occasion the children's height and weight were measured. Based on these measurements, Dr. Thompson concluded that over the seven and one-half month period while the children were living with Bruce, Travis grew much faster than an average boy, and Brandy and Wesley grew slightly less than average children. None of the children is significantly shorter than other children their age and none have exhibited any bizarre eating and drinking habits or antisocial behavior. The two older children have both had their intelligence quotients tested at over 100.

Dr. Thompson also testified that delayed bone age and height were not per se bad or good but that height velocity was a reflection of the child's general health. He further related the cause of psychosocial dwarfism is unknown and the only known remedial measure is a change of environment. Thompson's final diagnosis was that the Gravatt children suffered from psychosocial dwarfism caused by their environment and that they should be with their father.

At Sandra's request, the court appointed Dr. Wayne Christenson to evaluate the situation. Dr. Christenson is an M.D. with five years post-graduate training in adult and child-adolescent psychiatry at the University of Iowa and a specialist in child psychiatry. Christenson, together with a multidisciplinary team, including a psychiatric nurse and psychiatric social worker, examined Sandra and her family, Bruce and his family, the children, and extensive materials supplied to him by both parties. Dr. Christenson testified he spent in excess of 20 hours on the matter and also determined the children should be with their father.

At trial Sandra introduced the deposition of Dr. Moll. Dr. Moll, too, has impressive credentials including a fellowship in pediatric endocrinology from 1979 to 1981 and a primary interest in growth during puberty. Moll examined the children on one occasion. Moll admittedly did not have the background in the area of psychosocial dwarfism that Thompson did. Moll testified he had seen only one case of the problem. Moll did not make a determination as to whether or not the children were suffering from the condition; rather he determined additional time and data were necessary to make an accurate diagnosis. Admittedly our job and that of the trial court would have been easier had we had the benefit of additional study conducted over a longer period of time. We did not, however, turn a deaf ear to Thompson because he diagnosed a condition which has only recently been identified and is an ill-defined condition with no known cause. Certainly we must view his evidence carefully. Understandably, we would have been more comfortable if medical science had more guidelines for a diagnosis, but time is running for these children. The clock will not stop for these children while all the data comes in and the guidelines are clearly defined. An environment where growth and development are safeguarded is important to these children today.

Custody determinations are never easy. All parents have strengths and weaknesses. The courts are not privy to the interac-

tion between parents and children behind the closed doors of the family home. We must instead make our determinations based on the evidence presented. The experts agree that psychosocial dwarfism is an ill-defined condition with no known cause. The medical evidence is not conclusive; it is, however, heavily weighted to support Bruce's position. Dr. Thompson, who is unquestionably qualified in this very specialized area, diagnosed the children as suffering from its effects. Although there is no assurance that living with their father will alleviate the condition, the short-term effects produced after spending time with Bruce have been very promising.

■ Two well-qualified physicians, both of whom have spent considerable time with this case, testified the children should live with their father. We gave considerable weight to their testimony. We did not, however, make our determination on the medical evidence alone but considered it in the total spectrum of factors, including the following. Bruce has maintained a stable location. He and Cynthia, who is a respected R.N., have a secure home. Cynthia's three children, who live with them, are very well adjusted and are excellent students. The evidence indicates Bruce and Cynthia are loving and caring parents. Sandra, on the other hand, has moved frequently although her location now appears more stable. Sandra was found in contempt for violating a visitation order and has made it difficult for Bruce to exercise visitation and maintain contact with the children. The Iowa Supreme Court has been firm and clear in their position that children of a divorce need to maintain meaningful relationships with both parents. Attempts to alienate the child will adversely reflect on one's custodial abilities. *See In re Marriage of Leyda*, 355 N.W.2d 862, 866 (Iowa 1984).

■ While not controlling or subject to much weight, it is relevant that Travis and Brandy [1] expressed a preference for living with their father. *See In re Marriage of Bowen*, 219 N.W.2d 683, 689 (Iowa 1974)

where the court considered the preference of 10 and 11 year olds relevant. Deciding custody is far more complicated than asking children what parent they want to live with. *In re Marriage of Jones*, 309 N.W.2d 457, 461 (Iowa 1981). Children's preferences, while not controlling, are relevant and cannot be ignored. *In re Marriage of Burham*, 283 N.W.2d 269, 276 (Iowa 1979).

■ Weighing very heavily against Bruce in our determination was the fact that he is substantially behind in his child support obligations. In his defense on this issue we do note that his income is limited and despite an order to show cause he has not been found in contempt for failure to pay support. Poverty alone has never been accepted as a sound basis for declining to give either parent the custody and control of the issue of the marriage, providing they are otherwise equipped and the child's welfare would not be jeopardized. *In re Marriage of Jennerjohn*, 203 N.W.2d 237, 243 (Iowa 1972).

■ We found little relevance in Sandra's complaint that Cynthia put in a portable-type swimming pool and purchased a grand piano for her children. Cynthia is a substantial wage earner and the fact she uses her income to provide items to benefit her children is not relevant to the custody issue here.

■ We reverse the trial court order and modify the decree to provide Bruce shall have custody of the minor children. The transfer of custody shall occur following the completion of the 1984–85 school year. We remand to the trial court to determine Sandra's visitation with the children and if Sandra should pay child support and if so in what amount.

Sandra's request for attorney fees is denied. Each party shall pay their own attorney fees and one-half of the court costs.

REVERSED AND REMANDED.

All Judges concur except HAYDEN, J., who dissents.

1. Wesley, too, expressed a preference to live with his father, but in lieu of his young age we have given his preference no weight in our determination.

HAYDEN, Judge (dissenting)

I respectfully dissent. I do not believe that Bruce has met the *heavy burden* of showing that there has been a substantial change in circumstances since the date of the dissolution decree materially affecting the children's welfare.

The majority concludes that there has been a change in circumstances due in part to the children's development of a condition known as psychosocial dwarfism while in Sandra's custody. This is an ill-defined condition with no known cause in which children fail to grow at a normal velocity in one environment but grow at an accelerated rate in a different environment. In addition to the testimony of Dr. Thompson who made the diagnosis, the deposition of Dr. George Moll was made a part of the record. Dr. Moll obtained both M.D. and Ph.D. degrees from the University of Chicago. He completed a residency in pediatrics at Mott Children's Hospital at the University of Michigan and did a fellowship in pediatric endocrinology at the University of Chicago from 1979 to 1981. Dr. Moll testified that he saw the Gravatt children on December 26, 1983, and that he could not confirm or deny a diagnosis of psychosocial dwarfism based on one visit. He found nothing exceptional about the children since their heights were all at about the twenty-fifth percentile. After considering the children's bone age and the fact that the data on all three was consistent, Dr. Moll stated the children could be late bloomers which would result from an inherited pattern of growth rather than environmental factors. Dr. Moll noted that the children had a normal growth rate between the time of the first visit to Dr. Thompson and the visit to him. He stated that no conclusions could be drawn from that, however. Children normally grow at different rates at different times of the year. Dr. Moll opined that the only way to be sure of the diagnosis would be to compare growth rates from a whole year in one environment with those of a year in a different environment. He also observed that high intelligence quotients would not support a finding of a deprivational environment. He concluded that based on the data available, a diagnosis of environmentally related growth problems would be speculative. Finally, Dr. Moll said that the alleged psychosocial dwarfism of the Gravatt children was "certainly not an obvious case."

I do not dispute the majority's statement that the qualifications of Dr. Thompson are impressive. However, the trial court is in a superior position to evaluate the credibility of witnesses and we should give appropriate deference to that evaluation. Iowa R.App.P. 14(f)(7). I do not find enough conclusive evidence that the children are afflicted with this condition to justify reversing the trial court.

Finally, I am not convinced that Bruce has demonstrated a superior ability to minister to the children's needs. It is incredible that the best interests of these children require them to be in the custody of someone who has so flagrantly disregarded his obligation to support them. At the time of the modification hearing, Bruce owed $14,000 to Sandra and $5,000 to the State of Iowa for child support. However, Bruce and Cynthia purchased a swimming pool and a baby grand piano, and Cynthia reportedly owns all of the couple's assets, including the tools Bruce uses for his work. Contrary to the majority, I find these facts to be very relevant to the determination of who would be the best custodian of the children. One of Bruce's complaints about Sandra's care of the children is that their dental problems were neglected. Perhaps Sandra would have been able to take the children to the dentist more often if Bruce had been current on child support payments. In spite of his inability to pay child support, however, Bruce was able to take the children to the dentist and to the doctor on numerous occasions to build a case for custody modification. The attorney for the children testified that the children expressed a concern to him because they were taken to the doctor so frequently when they visited their father.

I would affirm the trial court and leave the children with their mother. However,

if there is to be a change of custody, I urge that Sandra should have liberal visitation rights.