# IN THE COURT OF APPEALS OF IOWA

No. 19-1304
Filed May 13, 2020

**TROY DAVID THORPE,**
Plaintiff-Appellee,

**vs.**

**KELSEY JOANN HOSTETLER,**
Defendant-Appellant.
_____

Appeal from the Iowa District Court for Greene County, Gina C. Badding,

Judge.

Kelsey Hostetler appeals the district court order modifying the parties'

shared care agreement and awarding Troy Thorpe physical care of their child.

**AFFIRMED.**

James R. Hinchliff of Shindler, Anderson, Goplerud & Weese, P.C., West

Des Moines, for appellant.

Michael Lewis of Lewis Law Firm, P.C., Cambridge, for appellee.

Considered by Tabor, P.J., and May and Greer, JJ.

**GREER, Judge.**

Kelsey Hostetler appeals the order modifying the shared-care arrangement and argues the court erred by granting physical care to Troy Thorpe. Kelsey argues Troy proved no changed circumstances impacting their 2017 agreed shared-care arrangement. In the alternative, she urges if physical care is changed she should be the physical care provider. Because circumstances changed making the shared-care arrangement unworkable, on our de novo review we agree with the district court. Finally Troy requests that Kelsey pay the costs of this appeal, including his expense for the transcript.

## I. Background Facts and Proceedings.

Kelsey and Troy never married; they had a child together in 2012. For a short time, they lived together with the child but then separated when the child was almost ten months old. At first after the split, Kelsey primarily managed the child's caretaking because Troy believed "small kids like that need to be with their mother."

Then in 2013, Troy established his paternity and the parties crafted a formal custody arrangement involving their child. The child first navigated under a joint custody arrangement with the mother having physical care.[1] But in 2016, Troy raised several changed circumstances he characterized as "substantial and material." Those concerns mainly involved communication between the parents, Kelsey's instability, and choice of school for the child. Troy's impression was that

---

[1] While Kelsey assumed physical care in 2014, the schedule for Troy's care was liberal. He had "visitation every other weekend from Friday at 8:00 a.m. to Monday at 8:00 a.m. and in alternating weeks from Monday at 8:00 a.m. to Wednesday at 8:00 a.m."

"there was a lot of moving going on and I didn't think it was good for the child." But while the 2016 proceedings were pending, in June 2017, Kelsey bought a home in Jefferson, Iowa, blocks from the child's school. Troy testified Kelsey assured him she "was going to be sticking around." With the moving concerns alleviated by that purchase, the parents stipulated to a shared physical care schedule. And they agreed that the child would attend the Greene County School District. Under the newly ordered June 2017 shared schedule, Troy managed the child's care every Monday and Tuesday, then Kelsey took care of the child every Wednesday and Thursday. The parents alternated weekends.

The background of each parent is important to understand context. At trial, Troy was thirty years old. He married Shannon in August 2015 and they have had two children, who were ages two and ten months at the time of trial. Shannon testified to a strong relationship with Troy and Kelsey's child. The child calls her "Mommy Shannon." Troy and Shannon live in a Jefferson, Iowa farm home, which he bought from his grandfather's estate. Troy farms with his family and operates a trucking business with Shannon. Acknowledging that farming is hard work, Troy described his schedule as often requiring long hours. During harvest seasons he might farm until 11:00 p.m. and work seven-day work weeks. Yet when harvest is over, he finishes the day and is home between 3:00 to 5:00 p.m. In his effort to operate the trucking company, he often runs loads at night for four hours after the children go to bed. Shannon works in the local Heartland Co-op office weekdays from 7:30 a.m. until 4:30 p.m. On a typical weekday morning, they leave home by 6:45 a.m. and take the children to daycare before school starts.

At trial, Kelsey, age twenty-six, resided in Waukee, Iowa with her boyfriend, Aaron Havill, and his two children when they visit him. Aaron invited Kelsey to move in with him in January 2018 after they met in the fall of 2017 through a dating site. Kelsey testified the actual move occurred around March 2018. The Waukee home was fifty-three miles from her Jefferson home. Ultimately, in September 2018, she sold the Jefferson home, closing her option to return there. At the time of the 2017 stipulation, Kelsey was a licensed practical nurse at the Unity Point Greene County clinic in Jefferson working for Dr. Van Der Veer. In March 2018, the doctor left that clinic and invited Kelsey to work for him in a different medical venture, Caremore. Kelsey stayed at Caremore until February 2019 and then decided to return to a Unity Point group in West Des Moines. Dr. Van Der Veer testified that he intends to hire Kelsey once he ramps up a new company called Exemplary Care. When she joins Dr. Van Der Veer, he estimated that with her new flexible work schedule, she will be paid $55,000 to $65,000 annually. Kelsey and the doctor confirmed that the new schedule would be flexible around child issues.

By all accounts at trial, Kelsey and Troy's child was happy, healthy, and thriving. But just months after agreeing on shared care of the child, in December, Troy learned from the child that Kelsey moved the two of them to her new boyfriend's home in Waukee. Until learning this from the child, Troy claimed he knew nothing about the new boyfriend or about the residence change. Kelsey admitted she failed to tell Troy about her move. Now with the move, Kelsey testified her commute between her Waukee home and Troy's is just over forty-four

miles and to the school around fifty miles. Troy characterized the trip as a "one-hour drive."

Finding the new shared-care arrangement "unworkable," Troy applied to modify the 2017 stipulation. His September 2018 filing highlighted changed circumstances involving Kelsey's move to Waukee, and, like his 2016 modification petition, poor communication issues and Kelsey's history of instability. Kelsey maintains these are long-standing issues for Troy and no change impacted the shared schedule adversely to justify a modification. At trial, the district court questioned "whether the June 2017 stipulated modification should be modified again." After hearing the evidence, the district court agreed with Troy's position and found the shared care schedule was unworkable. Determining that the evidence "tip[ped] the scales" in Troy's favor, the district court awarded joint legal custody with Troy having physical care. The court established liberal visitation for Kelsey and required her to pay child support of $469.69 per month. After moving to reconsider the decision, the district court granted Kelsey daily telephone contact between her and the child but denied all other requests to change the decision. Kelsey appeals the court's custody order.

## II. Scope of Review.

Our review of matters involving child custody and child support is de novo. *Phillips v. Davis-Spurling*, 541 N.W.2d 846, 847 (Iowa 1995). "[W]e examine the entire record and decide anew the issues properly presented." *In re Marriage of Rhinehart*, 704 N.W.2d 677, 680 (Iowa 2005). While we are not bound by the fact-findings of the district court, we give them weight, especially as to credibility

determinations. *In re Marriage of Dean*, 642 N.W.2d 321, 323 (Iowa Ct. App. 2002).

### III. Is Modification of the 2017 Custody Agreement Warranted?

Although Troy listed several changed circumstances, at the heart of this modification is the disagreement over whether this shared-care arrangement is workable given Kelsey's move. Kelsey advocates for retaining the shared-care plan. Troy counters with his opinion that circumstances have changed because the previous custody plan can no longer work. To help with our review, we benefit from an extremely well-written and fact specific district court decision. In the end, the district court agreed with Troy and we agree with the district court.

Troy faced a heavy burden in proving that a modification is warranted. *See In re Marriage of Mikelson*, 299 N.W.2d 670, 671 (Iowa 1980). The guiding principles used to determine whether a modification should occur are well-established:

> To change a custodial provision of a dissolution decree, the applying party must establish by a preponderance of evidence that conditions since the decree was entered have so materially and substantially changed that the children's best interests make it expedient to make the requested change. The changed circumstances must not have been contemplated by the court when the decree was entered, and they must be more or less permanent, not temporary. They must relate to the welfare of the children. A parent seeking to take custody from the other must prove an ability to minister more effectively to the children's well being.

*In re Marriage of Frederici*, 338 N.W.2d 156, 158 (Iowa 1983). And our primary focus is the best interests of the child. *In re Marriage of Fennelly*, 737 N.W.2d 91, 101 (Iowa 2007). With that in mind, "once custody of children has been fixed

it should be disturbed only for the most cogent reasons." *Frederici*, 338 N.W.2d at 158.

To condone a change in the last custodial order, Troy must prove a substantial and material change in circumstances since the June 15, 2017 order changing custody. *See id.* And as the district court examined the modification standards, the critical substantial change impacting custody became Kelsey's fifty-three mile move to Waukee. Yet Kelsey notes the potential to relocate was a concern of Troy's when he signed the shared-care agreement. So it cannot be a changed circumstance not contemplated. Indeed, it was a listed change of circumstance noted in Troy's 2016 petition to modify. And Kelsey also points to Troy's answer to an interrogatory where he stated: "[w]e also wanted to have something in writing stating that [the child] is ordered to attend school in the Greene County School District *no matter where the Respondent decided to relocate next* unless it was discussed and agreed to by both parties." (Emphasis added.)

Countering that argument, both Troy and Kelsey testified that Kelsey assured Troy that the purchase of the Jefferson house meant she was stable and staying in the community. *See In re Marriage of Slayman*, No. 16-1240, 2017 WL 2181865, at *2–3 (Iowa Ct. App. May 17, 2017) (confirming the father's move was not in the court's contemplation where he assured the mother his plan was to stay in the current location). Otherwise, Troy claims he would not have agreed to a shared-care plan and the requirement the child attend the Greene County Schools.

But the move to Waukee came after shared care started and was unknown to Troy when he agreed to shared care. Kelsey's subterfuge about the move reinforces Troy's version that it was not an expected change. Describing the

current custodial care situation, Kelsey notes that the shared-care experience lasted about twenty-three months before the modification trial and no one testified to any negative effect on the child. Of those months, she argues they shared care for nine months (thirty-nine percent of the time between the proceedings) while both lived in Jefferson. And without detriment to the child, for the remaining fourteen months (or sixty-one percent of the time between proceedings) Kelsey lived in Waukee and Troy remained in Jefferson. Kelsey's efforts at maintaining the status quo in spite of the travel distance has been extraordinary. Specifically she lists efforts mitigating the claim the shared care arrangement was "unworkable": (1) Kelsey handled all transportation between the homes and school, the child remained in the Jefferson school district as earlier agreed, (2) Troy testified his day-to-day life was unaffected by Kelsey's move, and (3) the child missed no Jefferson activities since the move. But our focus remains on not whether this schedule can managed, but if it is in the best interests of the child over the long-term to continue as is.

So we return to the best interests of the child. While all these efforts reduced the stress of the move, Kelsey failed to acknowledge any harm the move could bring to the child, now or in the future. She had no concerns about the one-hour drive back and forth between the Waukee house and Jefferson school. She saw no issues with having the child participate in extracurricular activities part-time in Waukee and part-time in Jefferson. Troy agrees that joint legal custody is appropriate, but claims a child shared-care arrangement with equal custodial time is impossible because of the distance between Jefferson and Waukee. *See In re Marriage of Hynick*, 727 N.W.2d 575, 579 (Iowa 2007) (noting that "[j]oint physical

care anticipates that parents will have equal, or roughly equal, residential time with the child").

Despite the benefits Kelsey gained from her move and that she has reduced the impact on Troy, the plan requires that the child travel an hour each way between Waukee and Jefferson either to school or for the transfers of care. As the child ages and becomes more involved in extracurricular activities, the stress of the commute falls on the child disproportionately. "Physical care issues are not to be resolved based upon perceived fairness to the *spouses*, but primarily upon what is best for the *child*." *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007). Because the parents now reside an hour drive apart, the shared-care arrangement is now unworkable and not in the best interests of the child. *See Teggatz v. Ellingson,* No. 19-1816, 2020 WL 2065944 at *2 (Iowa Ct. App. Apr. 29, 2020) (finding the hour travel time between the parties' homes was a "major obstacle" to joint physical care); *Slayman*, 2017 WL 2181865, at *3 (declining to award joint physical care because a ninety-eight mile commute was not in the best interest of the child); *Fitch v. Wurtz*, No. 12-1646, 2013 WL 988897, at *3 (Iowa Ct. App. Mar. 13, 2013) (noting that relocation of parent to location more than fifty miles away may deprive child of benefits of joint physical care requiring a change in the plan); *In re Marriage of Scurr*, No. 11-1905, 2012 WL 2122306, at *1 (Iowa Ct. App. June 13, 2012) (declining to award joint physical care because a forty-five minute commute was not in the best interest of the child); *In re Marriage of Metcalf*, No. 06-0324, 2006 WL 3018228, at *1 (Iowa Ct. App. Oct. 25, 2006) (finding that a move out of a child's school district requiring a drive of an hour or more between homes makes joint physical care arrangement unworkable).

We find Kelsey's move was a substantial and material change in circumstance requiring a modification of the shared care plan. Given that decision, we must select the superior physical care provider.

**IV. Who Can Best Minister to the Child's Needs?**

After two days of trial the district court found two factors that "tip[ped] the scales in Troy's favor." The first was the stability Troy offered. The second was the instability of Kelsey's life history. The court reviewed the positives and negatives of each parent before concluding Troy was best suited as the physical care provider. Stability and continuity of caregiving are important considerations in determining who should be physical care provider. *Hansen*, 733 N.W.2d at 696. "The objective of a physical care determination is to place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *Id.* at 695.

And when both parents are superior by all standards our task is monumental. Here the district court struggled, calling it "a close case." We agree. We first acknowledge that a new physical care schedule that significantly contrasts with the child's "past experience can be unsettling, cause serious emotional harm, and thus not be in the child's best interest." *Id.* at 697. Because these parents start on equal footing in our review and because Troy proved a material and substantial change in circumstances, we impose the standard of who has the ability to "minister more effectively to the routine daily needs of the [child]." *Frederici*, 338 N.W2d at 160.

Troy's key point is that Kelsey reverted to her history of unstable relationships and home situations. And the district court found Kelsey's instability

most concerning. "In custody modification cases, stability is the trump card." *Rolling v. Hoffman*, No. 14-0102, 2014 WL 2600315, at *2 (Iowa Ct. App. June 11, 2014). Within months after assuring Troy she would stay in her newly purchased Jefferson home, Kelsey moved to be with Aaron after just meeting him in the fall of 2017.[2] Some insight into the relationship came from text messages Kelsey sent to her friend in the summer of 2018. According to Kelsey, her relationship with Aaron was rocky and without love. *See In re Marriage of Decker*, 666 N.W.2d 175, 179 (Iowa Ct. App. 2003) (commenting that the type of relationship a parent establishes with an in-home companion might be "an indication of where that parent's priority for his or her child[ ] is in his or her life"). These text messages detailed exchanges between Kelsey and Aaron that involved screaming, name calling, and throwing an item while the children were present. Kelsey confided "I pray every night we find a way out of this hell." Kelsey's descriptions of events in those text messages revealed a chaotic home life in Waukee in the summer of 2018 that would not have suited the best interests of the child. Even Kelsey characterized the situation as an unsafe environment. She also clarified at trial that the couple had counseling and resolved those issues. But the district court, after hearing similar complaints about Aaron from his previous wife and after observing the testimony describing the concerning behaviors, found that Kelsey and Aaron's relationship "appear[ed] less than stable to the Court." Finally the district court also considered Kelsey's pre-modification history of short-term

---

[2] There is a discrepancy in the record about the move-in date. Kelsey testified it was in March 2018. Kelsey's boyfriend testified that he separated from his now ex-wife in October 2017, Kelsey's move occurred in January 2018, and his divorce was finalized in March of 2018.

relationships with men and multiple changes in residence as a factor supporting her instability. *See In re Marriage of Rierson*, 537 N.W.2d 806, 808 (Iowa Ct. App. 1995) ("It is well-settled children need a stable and caring home environment.").

Kelsey urged, and the court considered, factors that militate against an award of physical care to Troy. Those concerns related to Troy's controlling nature over Kelsey, the reality that Troy's schedule requires that Shannon cover much of his parental-care responsibilities, Troy's laborious work schedule, and Troy's non-involvement in the child's medical care and the activities in Waukee. Noting the behaviors of Troy and Shannon are getting worse, Kelsey testified she feels she is "told what [she] should do" rather than discussing what should happen with the child. Troy delegates to Shannon the communication with Kelsey about the child because of Troy's work schedule. Without the help of his wife, we have no clear picture of how Troy would operate on his own as a parent. While these areas of concern mitigate against Troy as the physical care parent, we have the history of his care over the life of the child. *See In re Marriage of Mayfield*, 577 N.W.2d 872, 874 (Iowa Ct. App. 1998) (finding the parent with physical care has the responsibility to engage the other parent in serious decisions about the child). Added to Troy's track record, Shannon has been involved with the child for many years, he has involved extended family in the area, and the child has a close relationship with the younger half-siblings. Keeping the half-siblings together weighs in Troy's favor. *See In re Marriage of Quirk-Edwards*, 509 N.W.2d 476, 480 (Iowa 1993) (noting that siblings, including half-siblings, should be separated only for the most compelling reasons). Thus, based on these factors and

considering the creditability findings of the district court, the scales do tip in Troy's favor.  We affirm the award of physical care in Troy.

**V.  Costs.**

We deny Troy's request for all costs of the appeal.

**VI.  Conclusion**.

In our de novo review we find that a substantial change in circumstances justified modifying the custodial arrangement.  We affirm the district court decision to award Troy physical care.  We deny the request for payment of costs to Troy.

**AFFIRMED.**