# IN THE COURT OF APPEALS OF IOWA

No. 24-0266
Filed May 7, 2025

IN RE THE MARRIAGE OF RYAN PAUL WALLER
AND SASHA NICHOLE KILL

Upon the Petition of
**RYAN PAUL WALLER,**
　　　Petitioner-Appellant,

**And Concerning**
**SASHA NICHOLE KILL,**
　　　Respondent-Appellee.
_____

　　　Appeal from the Iowa District Court for Polk County, Coleman McAllister,

Judge.


　　　Ryan Waller appeals the district court's decree dissolving the parties'

marriage. **AFFIRMED.**


　　　Jennifer H. De Kock of Coppola Hockenberg, P.C., West Des Moines, for

appellant.

　　　Anjela A. Shutts and Sydnee M. Waggoner of Whitfield & Eddy, P.L.C., Des

Moines, for appellee.


　　　Considered without oral argument by Tabor, C.J., and Ahlers and

Sandy, JJ.

**AHLERS, Judge.**

Ryan Waller and Sasha Kill married in 2009 and have three minor children (born in 2008, 2011, and 2015). Ryan petitioned to dissolve the marriage in early 2023. Following a trial, the district court issued a decree dissolving the marriage and resolving the issues raised by the parties.

Ryan appeals. He contends (1) the court erred in granting Sasha physical care of the children instead of granting the parents joint physical care; (2) the court incorrectly determined his income for support purposes; and (3) the court erred in the amount and duration of spousal support awarded to Sasha. Ryan makes several additional arguments, but for reasons we will discuss, they are not preserved for appellate review. Sasha does not cross-appeal, but she seeks an award of appellate attorney fees from Ryan.

## I.      Standard of Review

Because dissolution-of-marriage actions are equity actions, we review them de novo. *In re Marriage of Miller*, 966 N.W.2d 630, 635 (Iowa 2021). As such, we give weight to the district court's fact findings, especially as to witness credibility, but we are not bound by them. Iowa R. App. P. 6.904(3)(g).

## II.      Physical Care

Ryan requested the court grant the parties joint physical care of their three children, while Sasha asked for physical care to be awarded to her. In making physical-care determinations, our first and governing consideration is the best interests of the children. Iowa R. App. P. 6.904(3)(n). The main goal in determining physical care is to place the children in an environment that promotes the children's physical health, mental health, and social maturity. *In re Marriage*

*of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007). When determining whether joint physical care is in the best interests of a child, courts consider four key, nonexclusive factors: (1) stability and continuity of caregiving (sometimes referred to as "approximation" of the historical caregiving arrangement); (2) the parents' ability to communicate with and show respect to each other; (3) the degree of conflict between parents; and (4) the degree to which parents agree about their approach to day-to-day matters. *Id.* at 696–99. We also consider the factors listed in Iowa Code section 598.41(3) (2023) and those spelled out in *In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974). *In re Marriage of Fennelly*, 737 N.W.2d 97, 101 (Iowa 2007).

We start with the approximation factor. The record makes it clear that Ryan and Sasha love their children deeply and both play an active and important role in their daily lives. We recognize Ryan's contributions to the household, both financially and through his active participation in the children's extracurricular activities, as well as his involvement in childcare after school. Ryan works remotely and has some flexibility to care for the children during work hours, but he works full-time throughout the week. In contrast, Sasha has operated her own business since 2012, which has allowed her to set her own hours. This flexibility has enabled her to take on the responsibilities of scheduling medical appointments, interacting with teachers, and staying home with the children when needed. During the summer, Sasha has historically worked fewer hours to prioritize spending time with the children and avoid the need for a daycare provider. Both parties are active participants in the children's lives, but a review of the record convinces us that Sasha has historically been the primary caregiver—the same

conclusion reached by the district court. While this factor weighs in favor of granting Sasha physical care, it is not a dispositive factor, as we follow a multi-factored approach. *Hansen*, 733 N.W.2d at 697.

The next two factors focus on the level of conflict between the parties and their ability to communicate respectfully with one another. Here, the facts are somewhat unusual because the parties continued to live in the same house together with the children while their dissolution action was pending. The parties essentially divided the house and did their best to stay in their respective areas. Despite living in the same house, the parties did not have a substantive in-person conversation for months and instead communicated by text, only as necessary, to discuss children-related issues. Even with limited text communication, the parties were frequently unproductive and disrespectful in their exchanges. While the discord and rancor displayed in those exchanges did not sink to an alarming level, it sunk low enough to cause the district court concern that the parties did not "possess the ability to work together to provide for the children's needs." The court observed that their "conflict, acrimony, and tension is much greater than the natural tension and strain that arises between parties whose relationship is ending and who are engaged in litigating a custody dispute." Ultimately, the court concluded that "[t]he parties' inability to effectively communicate and to reach consensus on important decisions about the children does not favor a joint physical care arrangement." As the district court had the advantage of seeing the parties firsthand to gauge the level of discord—an advantage of which we are deprived by being limited to reviewing the cold transcript—we give these conclusions by the

district court considerable weight. As a result, we conclude the second and third factors cut against a grant of joint physical care.

The fourth factor considers the extent to which parents agree on their approach to day-to-day matters. We do not expect absolute agreement, but "the parents must generally be operating from the same page on a wide variety of routine matters." *Id.* at 699. For the majority of their marriage, it appears Sasha and Ryan were operating from the same page as it relates to the children. For example, they reached agreements on sleepover and cellphone policies and shared the same stance on teaching respect and responsibility in their home. However, the deterioration of their relationship has brought to light several disagreements that had not been at issue until more recently. Sasha contends the parties have different parenting styles, and when she tries to correct a child's behavior, Ryan either laughs it off or condones the behavior. The parties have also been unable to reach a consensus on general matters, such as what school the children will attend and how much each party is comfortable paying for extracurricular activities. While these topics fall within the realm of legal custody, *see* Iowa Code § 598.1(5) (defining "legal custody" to include making decisions about a child's education and extracurricular activities), disagreement about them also impacts a physical-care determination. These two topics were highly contested during the dissolution proceedings, with neither party willing to budge from their own request. Further, the parties had not even discussed finances, expenses, or Sasha's relocation from the marital home after the parties agreed Ryan would receive the home in the property division. This inability to

communicate effectively and reach necessary decisions that significantly impact the daily routine of the children does not support a grant of joint physical care.

We acknowledge that these factors are not exclusive, and the best interests of the children are what ultimately determine the physical-care decision. *Id.* at 695. Ryan asserts that joint physical care is in the best interests of the children. He points to Sasha's prior agreement to joint physical care and the minor children's wishes for joint physical to support his argument.

As for Sasha's prior agreement, we acknowledge that Sasha appears to have agreed to joint physical care early in the proceedings. However, she did not enter any binding agreement in that regard. Clearly, she changed her mind on this topic as the case progressed, and based on the factors previously discussed, we cannot conclude that her change of mind was unreasonable.

As to the children's preferences, that is a factor the district court and we are to consider. *See* Iowa Code § 598.41(3)(f). But the children's preferences are not controlling. *See In re Marriage of Burham*, 283 N.W.2d 269, 276 (Iowa 1979). The two oldest children, aged fifteen and thirteen at the time of trial, expressed their preference for joint physical care and a simple, week-on week-off schedule. But after examining the entire record, the district court determined that joint physical care was not in the children's best interests, opting instead for granting Sasha physical care with a parenting schedule that placed the children in her care for eight days and in Ryan's care for six days in any given two-week period. After giving consideration to the children's preferences and the district court's better position to gauge those preferences in relation to the ability or inability of the parties to work together productively and respectfully, we find the district court's resolution

of the physical-care dispute to be an equitable one that is in the children's best interests.

## III.    Ryan's Income

The parties disputed Ryan's income, which is relevant to resolving the parties' dispute over child and spousal support.  Sasha contends Ryan's income is $210,000 per year, while Ryan contends it is $185,000.  The district court accepted Sasha's calculation of $210,000 per year.

Ryan contends that the district court erred in calculating his annual income by characterizing his 401(k) and health savings account (HSA) contributions as additional income, asserting that they should have been treated as deductions.  He also argues the district court erroneously included his yearly stock award from his employer as part of his liquid income for purposes of determining support amounts.

Ryan's income fluctuates due to bonuses and stock awards he regularly receives.  In situations where a party's income fluctuates, determining the party's income is not an exact science.  Consequently, we give deference to the district court's income determination so long as it within the permissible range of the evidence.  *In re Marriage of Ruba*, No. 19-0365, 2019 WL 6358439, at *4 (Iowa Ct. App. Nov. 27, 2019).

Ryan is employed by a large corporation.  In addition to his base pay, he regularly receives bonuses and stock awards.  So, calculating his income should be relatively straightforward.  But we are hampered in our ability to assess the district court's determination of Ryan's income by the lack of testimony or other evidence about the various line items on his paystubs.  With that limitation in mind, our review of the record shows that Ryan's last paycheck in 2023—a few weeks

before trial in this case—shows his year-to-date gross pay was $200,959. This year-to-date figure did not include stock awarded to Ryan in 2023. The last paycheck of 2023 shows the stock awarded to Ryan in 2023 was valued at $41,965—which is in addition to his wages totaling $200,959. As Ryan explained it, the stock awards are given in a dollar amount, not in the form of stock. The awards do not immediately vest. Instead, they vest quarterly over a five-year period. At each quarter's vesting date, the applicable amount of stock award is essentially used to purchase stock at the price on that date. So, the $41,965 of stock award Ryan received in 2023 will be converted to stock quarterly from 2024 through 2028 as it vests. Until it vests, Ryan is not entitled to anything. So, if Ryan leaves his employment, he loses any unvested parts of the stock award.

We are not persuaded by Ryan's argument that we should not consider the stock awards in calculating his income. Salary packages can be significantly enhanced by non-salary items. *In re Marriage of Huisman*, 532 N.W.2d 157, 159 (Iowa Ct. App. 1995). Ryan has historically received the stock awards as part of his compensation package, and there is no evidence in the record that Ryan is leaving his employment or that stock awards will not be made in the future. As a result, the risk of the awards not vesting is speculative. If and when Ryan leaves his employment or is no longer receiving stock awards, that it is an occurrence that can be taken up in a future modification action. Until then, we are persuaded that the stock awards are part of Ryan's compensation package that is properly considered in calculating his income. After considering Ryan's 2023 year-end gross pay of $200,959 and adding the $41,965 of stock awards, the district court's

determination that Ryan's yearly income is $210,000 is well within the permissible range of the evidence.[1]  *See Ruba*, 2019 WL 6358439, at *4.

## IV.    Spousal Support

Iowa recognizes four kinds of spousal support: (1) traditional; (2) reimbursement; (3) rehabilitative; and (4) transitional.  *In re Marriage of Sokol*, 985 N.W.2d 177, 185 (Iowa 2023).  Each serves a different purpose.  *Id.*  Here, the district court ordered Ryan to pay Sasha $2500 per month of transitional spousal support for eighteen months.  Transitional spousal support is awarded when "the recipient spouse may already have the capacity for self-support at the time of dissolution but needs short-term assistance in transitioning to single life."  *Id.*

Ryan does not challenge the district court's decision to award transitional spousal support, but he challenges the duration and amount.  He contends $1000 per month for six months is a more equitable spousal-support award.  The crux of his argument is that Sasha deliberately minimized her income, failed to disclose assets, and chose not to secure stable employment or permanent housing in the months leading to trial.

Spousal support determinations are reviewed de novo, but because the district court is given considerable latitude in these decisions, we will only disturb the award when there has been a failure to do equity.  *In re Marriage of Mann*, 943

---

[1] Our methodology in calculating Ryan's income makes it unnecessary to address his complaint of the district court's methodology in considering his 401(k) and HSA contributions in calculating his income, as we did not make any adjustments to Ryan's income for those contributions.  Our conclusion that the district court's determination of Ryan's income at $210,000 is within the permissible range of the evidence is bolstered by the fact that Ryan's 2023 year-end paystub showed taxable income of $215,598 after accounting for his stock awards, 401(k) contributions, and HSA contributions.

N.W.2d 15, 20 (Iowa 2020). When deciding whether to award spousal support—as well as determining its amount and duration—courts are to consider all of the following:

> a. The length of the marriage.
> b. The age and physical and emotional health of the parties.
> c. The distribution of property made pursuant to section 598.21.
> d. The educational level of each party at the time of marriage and at the time the action is commenced.
> e. The earning capacity of the party seeking maintenance, including educational background, training, employment skills, work experience, length of absence from the job market, responsibilities for children under either an award of custody or physical care, and the time and expense necessary to acquire sufficient education or training to enable the party to find appropriate employment.
> f. The feasibility of the party seeking maintenance becoming self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage, and the length of time necessary to achieve this goal.
> g. The tax consequences to each party.
> h. Any mutual agreement made by the parties concerning financial or service contributions by one party with the expectation of future reciprocation or compensation by the other party.
> i. The provisions of an antenuptial agreement.
> j. Other facts the court may determine to be relevant in an individual case.

Iowa Code § 598.21(A). Since the decision to award spousal support is based on the specific facts of each case, the district court only needs to address those factors that are pertinent to the case at hand. *Id.* § 598.21(A)(2).

By the time of their dissolution trial, the parties had been married for nearly fifteen years. Ryan holds a bachelor's degree and works as a senior program manager for a large corporation. In contrast, Sasha has an associate's degree and has held a variety of jobs throughout her life. In 2012, she founded her own business, which does "all sorts of digital design and web design." However, during

the dissolution proceedings, she testified that she stopped actively running the business to pursue a full-time job and focus on the children.

In support of his contention that Sasha intentionally underemployed herself, Ryan points to the fact that Sasha obtained employment while the dissolution was pending but then quit the job. But the record does not paint as nefarious a picture as Ryan suggests. About fifteen months before the dissolution trial, as Sasha began to minimize her work at her web-based business, she was hired as a creative director by a company for approximately $90,000 per year. She only worked there for one month. During the hiring process, she had been told the job hours were flexible enough to allow her to remain involved with the children before and after school. But once she started, she found out that was not the case. When she discussed her concerns with management, the human resources manager suggested she might explore other options, and Sasha interpreted this as the termination of her position. We do not view Sasha leaving a job because it did not provide the flexibility she had been promised as intentional underemployment.

In addition to arguing Sasha's departure from the high-paying job was a deliberate attempt to minimize her income, Ryan also contends she understates what she could earn at her web-based business, and she has no good excuse for failing to work that job as she did in the past. While we do agree with the district court that Sasha's choice to essentially put her business in neutral during the pendency of this action was a questionable decision, we also believe she can rebuild the business if she chooses to do so. The district court addressed this concern by imputing an income of $60,000 to Sasha for support purposes. This figure considers the fact that, after the salary paid to Sasha, her business earned

$40,673 in 2020, which Sasha testified was an unusually busy year. Between the business's earnings and her salary, Sasha earned a total of $53,473 that year—her best year in the past six years for which records were provided.[2] Based on our de novo review of the record, we find the district court's imputation of $60,000 to Sasha to be within the permissible range of the evidence. *See Ruba*, 2019 WL 6358439, at *4. Given this income for Sasha, we find some amount of transitional spousal support is warranted—a point Ryan does not challenge on appeal.

The parties have agreed throughout this proceeding that Ryan will receive the marital home in the property division. Despite that agreement, Sasha made no arrangements to secure her own residence. Ryan points to Sasha's failure to do so as a reason to reduce the duration of transitional spousal support. While we agree that it would have been preferable for Sasha to have arranged housing for herself and the children before trial, we acknowledge she may not have been in a position to make such arrangements, especially before knowing how the physical-care dispute was going to be resolved and what she would be receiving in child and spousal support. This is precisely why the district court awarded transitional spousal support—to help Sasha transition from married to single life. *In re Marriage of Pazhoor*, 971 N.W.2d 530, 545 (Iowa 2022) ("[T]ransitional alimony is appropriate when a party capable of self-support nevertheless needs short-term

---

[2] Neither the district court nor we can determine the business's earnings for 2023, as Sasha did not provide much in the way of records for that year. While we do not condone Sasha's failure to produce complete records, we note that the record shows that record-keeping is not her strong suit, so we are not persuaded that the failure to produce complete records was intentional. The record is unclear as to what efforts Ryan made to obtain Sasha's records in a timely manner if he wanted those to present to the court.

financial assistance to transition from married to single life.").

Given the disparity in incomes—$210,000 for Ryan and $60,000 for Sasha—we find the amount of the spousal support to be within a reasonable range, albeit at the top end of that range. As to duration, because transitional spousal support is designed to solve a short-term liquidity issue, it should be of short duration, generally not exceeding one year. *Sokol*, 985 N.W.2d at 187. While the eighteen-month award here stretches reasonableness, we are mindful of the supreme court's caution against undue tinkering with spousal support awards, so we decline to modify the spousal-support award here. *See id.* at 182 ("The institutional deference afforded the district court in determining spousal support counsels against undue tinkering with spousal support awards."). We find the district court's spousal support award of $2500 per month for eighteen months to be equitable.

## V. Other Issues

In addition to the aforementioned issues, Ryan requests we: (1) modify the property division to account for Sasha's dissipation of assets to pay for her life coach; (2) set a valuation date for one of the financial accounts awarded to Ryan; (3) modify the pick-up and drop-off time for holiday and summer parenting time; (4) determine the amount each parent is required to contribute toward the expenses for agreed-upon extracurricular activities of the children; and (5) order spousal support to terminate upon Sasha's remarriage or cohabitation. Sasha contends Ryan failed to preserve error on these issues, and we agree.

Before we can consider a claim on appeal, a party must first preserve error by raising an issue and securing a ruling on the issue from the district court. *Meier*

*v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002). This gives the district court an opportunity to correct any errors at a time when corrective action can be taken. *In re Marriage of Heiar*, 954 N.W.2d 464, 470 (Iowa Ct. App. 2020). These error-preservation rules also ensure that we are acting as a court of appeals, reviewing a decision made by the district court, rather than considering an issue for the first time on appeal. *Meier*, 641 N.W.2d at 537. These error-preservation requirements apply to dissolution-of-marriage proceedings that are reviewed de novo. *In re Marriage of Huston*, 263 N.W.2d 697, 699–700 (Iowa 1978).

We first address Ryan's claim that Sasha's payment to her life coach constitutes dissipation of marital assets and he should therefore be entitled to an adjustment of the property division to recoup one-half of that expense. Assuming without deciding that Ryan raised this issue—a dubious assumption given that Ryan's only mention of dissipation at trial was a passing reference during closing argument—the district court did not address it. To preserve error on an issue raised but not decided by the district court, Ryan was required to file a motion under Iowa Rule of Civil Procedure 1.904(2) or bring the failure to address the issue to the district court's attention in some other manner to preserve it. *See Meier*, 641 N.W.2d 537–38. He did not do so. As such, the issue is not preserved for our review, so we do not consider it.

Ryan also challenges three specific details of the decree. He asks us to decide how the children's extracurricular activity expenses will be divided;[3] alter

---

[3] It is not entirely clear from Ryan's briefs whether he is raising this issue independently of his challenge to the physical-care determination. He appears to be asking for a division of the cost of extracurricular activities only if he were successful in obtaining a modification of the decree to grant the parties joint

the holiday and summer parenting schedule to make pick-up and drop-off times consistent; and establish a valuation date for a financial institution account awarded to Ryan. He claims these issues were raised because he testified about them at trial and addressed them in his proposed decree. Our review of the record finds no indication in Ryan's testimony or proposed decree that would have alerted the district court that these details were at issue. But even if Ryan's testimony or proposed decree technically raised these issues, when the decree was issued without addressing them, Ryan made no effort to bring these matters to the district court's attention to address them. Ryan's failure to notify the district court that it neglected to address these issues and ask for a ruling on them means he failed to preserve error on them. *See id.* As a result, we do not consider them.

Lastly, Ryan asks us to terminate Sasha's spousal support upon her marriage or cohabitation, arguing it is inequitable to require him to request a modification if this situation were to arise. Again, Ryan has not shown that he raised this issue to the district court. Even if he did, the district court did not address it, and Ryan took no steps to bring this failure to the district court's attention. Error was not preserved, so we decline to consider this issue. *See id.*

---

physical care of the children. As Ryan has been unsuccessful on that issue, if his claim is conditional, it is moot. If Ryan's claim is not conditioned on modification of physical care, it is not clear what the nature of his request is. Typically when, as here, one parent is granted physical care and the other parent pays child support, the parent granted physical care is responsible for the children's expenses absent a deviation from the guidelines that did not occur here. *See Heiar*, 954 N.W.2d at 473. We need not try to resolve this uncertainty as to the nature of Ryan's claim, as he failed to preserve it for our review.

**VI.    Appellate Attorney Fees**

Sasha's brief makes a passing reference to a request for an award of appellate attorney fees from Ryan, but she did not set this out as a separate issue heading, made no substantive argument in support of her claim, and cited no authority in support of her passing reference, all in violation of our rules of appellate procedure.  *See* Iowa R. App. P. 6.903(2)–(3).  We decline to develop an argument and find authority for her.  As such, we deny her request.

**VII.    Conclusion**

Following our de novo review, we affirm the district court's decree.  The district court correctly determined that granting Sasha physical care was in the children's best interests.  The decree also equitably determined Ryan's income and equitably determined the amount and duration of spousal support awarded to Sasha.  We decline to address Ryan's arguments that were not preserved for our review.  We deny Sasha's request for appellate attorney fees.

**AFFIRMED.**